**KILGORE CORPORATION**

v.

**The UNITED STATES.**

**Nos. 219–72, 220–72 and 410–73.**

United States Court of Claims.

Dec. 12, 1979.

As Corrected and Amended Jan. 25, 1980.

Robert B. Yorty, Washington, D. C., attorney of record, for plaintiff. Lowell J. Bradford, Gordon W. Hatheway, Jr., and Richard O. Duvall, Washington, D. C., of counsel.

David S. Eisenberg, Washington, D. C., with whom was Acting Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant. Gerald D. Freed, Washington, D. C., of counsel.

Before SKELTON, Senior Judge, KASHIWA and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on the parties' exceptions to the recommended decision of Trial Judge David Schwartz, filed September 26, 1978, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Since the court agrees with the trial judge's recommended decision and conclusion of law, as modified by the court, as hereinafter set forth,* it hereby affirms and adopts the same, as modified, as the basis for its judgment in this case.

## OPINION OF TRIAL JUDGE

### SCHWARTZ, Trial Judge:

This proceeding is brought to determine whether profits earned by the plaintiff Kilgore Corporation in 1967, 1968 and 1969, in the performance of contracts subject to renegotiation, were excessive under the Renegotiation Act of 1951, as amended, 50 U.S.C. App. § 1211 *et seq.* (1970), and if so, to what extent.

Plaintiff, located in Hardeman County, Tennessee, manufactures pyrotechnic prod-ucts important in modern warfare. In the years under review, plaintiff's sales and profits increased substantially, by reason of the surge in the demand for material for the Vietnam War. Following administrative determination by the Renegotiation Board of excessive profits of $950,000 in 1967, $750,000 in 1968 and $550,000 in 1969, plaintiff sued in this court under section 108 of the Act for a *de novo* redetermination of excessiveness, *vel non.* 50 U.S.C.App. § 1218 (Supp. V, 1975). The decision here is that profits were excessive in the respective amounts of $295,000 in 1967, $115,000 in 1968 and $95,000 in 1969. The facts relevant to excessiveness and to the statutory factors whose consideration is directed by section 103(e) of the Act, 50 U.S.C.App. § 1213(e) (1970), are recounted in detailed findings of fact which have been filed and furnished to the parties. This opinion will touch only on the facts necessary for an understanding of the decision.

Among those facts, the elements of the following table are the most important (000's omitted; unless otherwise indicated, all amounts are descriptive of renegotiable production; thus "sales", "net worth" and "costs" are the renegotiable-allocable respective amounts):

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his decision, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

| | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 |
|---|---|---|---|---|---|---|
| **Types of Sales** | | | | | | |
| Reneg. sales-% of total............ | .76.0% | 74.2% | 88.9% | 91.9% | 89.4% | 93.0% |
| Nonreneg. sales-% of total......... | .24.0% | 25.8% | 11.1% | 8.1% | 10.6% | 7.0% |
| Nonreneg. pyrotechnic sales– % of total....... | | | | 3.3% | 4.6% | 2.7% |
| **Reneg. Sales & Profits** | | | | | | |
| Sales.............. | $3,379 | $3,801 | $12,231 | $16,254 | $13,541 | $21,108 |
| + GFM............. | | | | $ 2,051 | $ 1,133 | $ 2,282 |
| Total.............. | | | | $18,305 | $14,674 | $23,390 |
| Profits............ | $ 412 | $ 366 | $1,236 | $ 2,523 | $ 2,071 | $ 2,730 |
| Profit/sales % | 12.2% | 9.6% | 10.1% | 13.8% | 14.1% | 11.7% |
| 3-yr. aver. Profit/sales % | ------ | 10.4% | ------ | | 13.0% | ------ |
| Profit on sales in excess of 10.4%......... | | | | $ 619 | $ 545 | $ 297 |
| **Nonreneg. Sales & Profits** | | | | | | |
| Nonreneg. sales............. | $1,068 | $1,322 | $1,522 | $1,437 | $1,610 | $1,586 |
| Profits .......... | $ 184 | $ 292 | $ 394 | $ 235 | $ 448 | $ 312 |
| Profit/sales %..... | 17.2% | 22.1% | 25.9% | 16.4% | 27.8% | 19.7% |
| **Net Worth & Return Thereon** | | | | | | |
| Beginning net worth........ | $ 973 | $1,181 | $1,687 | $2,466 | $3,755 | $5,070 |
| % Increase......... | 21.4% | 42.8% | 46.2% | 52.3% | 35.0% | 20.5% |
| Ending net worth..... | $1,181 | $1,687 | $2,466 | $3,755 | $5,070 | $6,108 |
| Profits............ | $ 412 | $ 366 | $1,236 | $2,523 | $2,071 | $2,730 |
| Aver. net worth (ANW)...... | $1,077 | $1,434 | $2,077 | $3,111 | $4,413 | $5,589 |
| % Return on ANW...... | 38.3% | 25.5% | 59.5% | 81.1% | 46.9% | 48.8% |
| 3-yr. aver. return on ANW...... | ------ | 43.9% | ------ | | 55.9% | ------ |
| 43.9% of ANW...... | | | | $1,366 | $1,937 | $2,454 |
| Return on ANW in excess of 43.9% | | | | $1,157 | $ 134 | $ 276 |

| | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 |
|---|---|---|---|---|---|---|
| **Costs** | | | | | | |
| Direct labor costs (DLC) as % of cost of goods (COG) | 9.3% | 10.4% | 5.4% | 5.5% | 5.9% | 6.3% |
| 3-yr. aver. DLC as % of COG | | 7.0% | | | 5.9% | |
| Indirect Mfg. Expense (IME) as % of COG | 23.4% | 23.9% | 13.9% | 13.1% | 16.7% | 15.7% |
| 3-yr. aver. IME as % of COG sold | | 17.4% | | | 15.1% | |
| **Profits in Excess of Aver. 1964–66 Profit** | | | | | | |
| Profit on sales in excess of 10.4% | | | | $ 619 | $545 | $297 |
| Return on ANW in excess of 43.9% | | | | $1,157 | $134 | $276 |
| Total | | | | $1,776 | $679 | $573 |
| divided by 2 equals | | | | $ 888 | $340 | $287 |
| **Excessive Profits** | | | | | | |
| Determined by Reneg. Bd. | | | | $ 950 | $750 | $550 |
| Determined Herein | | | | $ 295 | $115 | $ 95 |

[1] In the following text, the character of plaintiff's business, its efficiency, risks, net worth and contribution to the defense effort—five of the six factors bearing on excessiveness specified in section 103(e) of the Act, 50 U.S.C.App. § 1213(e)—will be disposed of first. Discussion of the sixth factor, reasonableness of costs and profits, will follow and, finally, the determination of the amount of excessive profits on the basis of the combined effect of all the factors.

1. *Character of Business and Efficiency.* Over the years since 1920, plaintiff has developed growing abilities in the production of pyrotechnic products such as parachute flares and marine smoke distress signals. A flare called the Mark 24, which illuminates a battlefield as it floats to the ground by parachute, accounted for over half of plaintiff's renegotiable business in the review years. A variation on the Mark 24 is a marine marker containing phosphorous which is launched into the sea and ignites on contact with salt water. Production of such products, all under renegotiable contracts, constitutes over 90 percent of plaintiff's business. (The present tense is used for the review years.)

The remaining, nonrenegotiable part of plaintiff's business is led by paper caps for toy pistols. Other nonrenegotiable products are distress signals used in recreational boating, highway flares and railroad fuses. About half of the nonrenegotiable products is composed of pyrotechnics.

Pyrotechnic manufacturing technique requires explosive-resistant, reinforced buildings, widely separated from each other, and other elaborate safety measures associated with the mixing and blending of explosives. A large plant is thus necessary. Plaintiff has 88 buildings on 300 acres.

Plaintiff enjoys good management, technical and engineering resources, labor force and safety record. Plaintiff's specialty is the mixing and blending of the explosive ingredients in its products. Parts and subassemblies are purchased widely from small sources and subcontractors. Plaintiff's flares and signals, which are complex without being extremely so, are produced by an efficiently engineered and managed system, employing a number of skilled and a larger number—about 80 percent of the total—of unskilled but well-trained workers. After machinery and methods are installed and settled, the work calls for repetitive though delicate operations.

Rejections or bad quality are substantially unknown. Volume is very good; three shifts were installed to meet wartime demand. The increase in shifts more than tripled production without any appreciable loss in quality or increases in cost, entitling plaintiff to special credit. *Mills Mfg. Corp. v. United States,* 215 Ct.Cl. 536, 561, 571 F.2d 1162, 1175 (1978). Deliveries are made substantially on time, except when the plant is overloaded with orders, as it was in 1967 and 1969.

Most or all of plaintiff's renegotiable contracts in the review years were firm, fixed-price contracts, concluded after negotiation. Costs—and consequently prices to the Government—were remarkably lower than those of other producers of the same products. Costs were controlled well in the period of increased production during the Vietnam War, as may be seen in the table above.

Plaintiff performs very well in respect of quantity, quality, timeliness of deliveries, expansion of efforts for defense, maximum use of production facilities and use of subcontractors and small business. All of these are subfactors to the statutory factors of character of business and efficiency. In brief, plaintiff's products are better and cheaper than those of other producers. See Renegotiation Board Regulations § 1460.-9(b), 32 C.F.R. § 1460.9(b) (1974) hereinafter cited by section as—"Regulations."

Plaintiff is entitled to some favorable consideration, in respect of character of its business, its engineering techniques and its extensive use of small suppliers and subcontractors. Renegotiation Act of 1951, as amended, section 103(e)(5), 50 U.S.C.App. § 1213(e)(5); Regulations, §§ 1460.14(b)(1) & (b)(3)(i). For its efficiency, conceded by the Government, plaintiff is entitled to a high degree of favorable consideration. Regulations, § 1460.9.

2. *Risk.* The risk of explosion in pyrotechnic production is real and always present, but the financial consequences are minimized by property damage and workmen's compensation insurance. Plaintiff was unable, though it sought to do so, to obtain business stoppage insurance.

A sacrifice of commercial business, by reason of concentration on wartime military

orders, is claimed, but without support in the record. Sales to non-Government customers were substantially higher in the review years than in the base period. Profits rose accordingly; profit rates, while they fluctuated from 17 to 26 percent in the base period and from 16 to 28 percent in the review years, on an average dropped less than 1 percent.

While total profits declined to the point of net losses in years following the review years, the record does not suggest that the decline was a consequence of review-year business in aid of war production, as in *Butkin Precision Mfg. Co. v. United States*, 211 Ct.Cl. 110, 544 F.2d 499 (1976), or *Blue Bell, Inc. v. United States*, 213 Ct.Cl. 442, 556 F.2d 1118 (1977). There is ·thus no showing of a loss of commercial customers; no showing that a decline in profit margins in post-review years was attributable to a concentration on military work. *Cf. Major Coat Co. v. United States*, 211 Ct.Cl. 1, 39, 543 F.2d 97, 119 (1976).

Close pricing policy, especially when coupled with firm fixed-price contracts, ordinarily indicates a degree of risk. Regulations, § 1460.12(b)(2). Plaintiff, however, had no difficulty in building a 12 percent profit into its prices to the Government. In the wartime market, contracts were let by negotiation and plaintiff's prices, while lower than those of its competitors, were set on the basis of its costs and a more or less guaranteed profit of 12 percent. No credit is therefore warranted for pricing risks. For much the same reason, no particular credit is due for the risks usually associated with production under fixed-price contracts. Substantial amounts of material for use in production were in the war years furnished to plaintiff by the Government and the record shows no difficulties in obtaining raw materials and parts at dependable prices, to realize the profit estimated in contract negotiations. In sum, plaintiff experienced no increase in risks in the review years or high risks in comparison to another producer or another period. *Mills Mfg. Corp., supra*, 215 Ct.Cl. at 566, 571 F.2d at 1177.

3. *Net Worth*. There is no credit due under this factor. Plaintiff was highly liquid and without long-term debt in the war years. Need for capital was reduced by prompt and substantial progress payments and the furnishing by the Government of the magnesium explosive used in production during the war.

In a remarkable increase in net worth by reason of the wartime profits now under review, average net worth (allocable to renegotiable business) rose from $1,484,000 in the 3 years 1964–66 to $4,364,000 in 1967–69. These increases created such surplus and liquidity as permitted the making of substantial loans to plaintiff's parent in the war years, in a reversal of earlier loans from parent to subsidiary; details are given below in another connection. In view of the sharp increases, it become appropriate to substitute average net worth for beginning net worth, ordinarily the starting point for comparisons involving net worth. *Mills Mfg. Corp., supra*, 215. Ct.Cl. at 555 n.11; 571 F.2d at 1172 n.11; *Aero Spacelines, Inc. v. United States*, 208 Ct.Cl. 704, 747, 530 F.2d 324, 350 (1976); Regulations, § 1460.11(b)(4). The substitution has relevance to the return on net worth, discussed below.

4. *Contribution to the War Effort.* Plaintiff cooperated with and assisted its subcontractors, other defense contractors and the Government. Modest contributions to defense were made by a few improvements in design and tooling. All in all, the contribution was of the sort an efficient defense contractor makes; no such unusual contributions to the art or inventiveness appears as is contemplated for special credit under this factor. *Manufacturers Service Co. v. United States*, 217 Ct.Cl. ——, ——, ——, 582 F.2d 561, 575–76, 578 (1978); *Aero Spacelines, Inc., supra*, 208 Ct.Cl. at 736–38, 530 F.2d at 344–45; Regulations, § 1460.-13(b)(6).

Nevertheless, plaintiff is entitled to some recognition for the cooperation and assistance it gave to the Government and other producers, and for having produced an abundance of excellent quality materiel

needed in time of war, under conditions hazardous to its laboring force. *Page-River-Curran v. United States*, 216 Ct.Cl. 246, 266–67, slip. op. 18, reported in part, 574 F.2d 1063 (1978); *cf. Blue Bell, Inc., supra*, 213 Ct.Cl. at 479, 556 F.2d at 1140.

5. *Accounting Adjustments to Renegotiable Sales and Profits.* Several contentions are presented, by both parties, as to adjustments appropriately to be made in the fiscal data which is to be the basis for the determination as to excessive profits. The following disposition of these contentions is incorporated into the data table, above.

(1) Plaintiff asks for a revised depreciation allowance more generous than the formula on its books and in its pretrial submissions. The new allowance is held to be an afterthought, not shown to be of sufficient merit to replace the books of account.

(2) The Government urges that plaintiff's net worth should be reduced—and the return on net worth thereby increased—by the elimination from capital allocable to renegotiable business of loans to plaintiff's parent, amounting to $454,000 in 1968 and $1,637,000 in 1969. The ground is that these sums were not used or needed in plaintiff's renegotiable business.

The facts are that sums earned by plaintiff as profits, left liquid, were advanced to the parent for several years, and recalled in post-review years, for use in rebuilding the plant. Until needed, they were placed with the parent as short-term loans. They passed Internal Revenue Service scrutiny as loans. The move to subtract the loans from net worth is rejected for lack of any showing that they were not legitimate assets needed in plaintiff's operations over the long run.

(3) Another Government attack on plaintiff's fiscal showing, also rejected, charges that a profit-sharing plan put into effect in 1967, the first of the review years, was a method for siphoning off profits which were otherwise excessive and as such owed to the Government. In the 3 years under review, the renegotiable-allocable costs of the plan were respectively $161,358, $139,884 and $129,538. The Government would increase annual profits by these amounts.

In brief, the plan provided for an employer contribution of 12 percent of after-tax income, provided net income exceeded 5 percent of beginning net worth. The plan was put into effect in a year in which it could be anticipated that profits would be large and perhaps excessive under the Act; a clause for adjustments to take renegotiation into consideration, shows that the plan was written with renegotiation in mind. But this does not disqualify the plan's costs from allowance as a legitimate expense chargeable to renegotiable costs.

Whatever is paid out under a profit-sharing plan of course lessens profits subject to renegotiation, and there might be circumstances in which it would appear that a plan is an improper diversion of otherwise excessive profits. One such circumstance is the payment to officers or employees of sums which are excessive and unreasonable compensation. *Cf. A. C. Ball Co. v. United States*, 209 Ct.Cl. 223, 241, 531 F.2d 993, 1003 (1976). No such finding can here be made. The plan was not unconventional, the costs were not excessive. The plan has been approved by the Internal Revenue Service, under sections 401 and 404(a) of the Code, and has become a permanent part of plaintiff's manner of doing business. Almost 70 percent of the employees and officers were eligible to join the plan at its institution and 90 percent of those eligible have become members. The stated purpose of the plan—the reduction of labor turnover and creation of incentive—was thus achieved.

The payments to employees and officers, as additional compensation, doubtless contributed to the quality and volume of production. The Government has perhaps thereby received more than the equivalent of what it lost by a reduction in the profits subject to recoupment as excessive. On all the considerations, therefore, there is little reason to deny the costs of the plan their normal effect as reasonable costs which decrease profits. *Blue Bell, Inc., supra*, 213 Ct.Cl. at 459–61, 556 F.2d at 1130–31; Regulations, § 1459.1(b)(5).

(4) Next is the claim of the Government for the disallowance of plaintiff's 1967 contribution to a charitable foundation maintained by the parent corporation 70 miles away, in another county. In earlier years, plaintiff's annual renegotiable-allocable contributions to charitable organizations never exceeded $1,000. In 1967, the first of the three review years, plaintiff contributed $156,160 to the parent's foundation, of which $144,307 is allocable to renegotiable business. In 1968 and 1969, charitable contributions were reduced to pre-1967 levels, $1,470 and $2,306, respectively.

A half-hearted attempt is made to prove that the foundation assists organizations such as the Boy Scouts, the Girl Scouts and the Mental Health Association which in turn help plaintiff's employees. Perhaps, but it is highly doubtful that philanthropy or even employee welfare was the motive for the 1967 unprecedented contribution.

The contribution in 1967 is disallowed as a cost or expense allocable to renegotiation, though the IRS passed it. It was a diversion of profits properly belonging with total renegotiable profits for scrutiny as excessive under the Act. No reasonable connection is shown between such an unprecedented contribution and the performance of renegotiable business. Section 103(f), Renegotiation Act, 50 U.S.C.App. § 1213(f) (1970); Regulations, § 1459.8(b)(2); cf. A. C. Ball Co., supra. On the disallowance, renegotiable profits for 1967 are increased by $144,307.

(5) Finally, there is a matter of approximately $5.4 million worth of magnesium, supplied by the Government to plaintiff for use in manufacturing parachute flares in the review years. The year-by-year value was $2,050,880 in 1967, $1,132,715 in 1968 and $2,282,175 in 1969.

Plaintiff performed the same operations in the base period as in the review years. Its cost savings on being relieved of the effort of furnishing of GFM-magnesium in the review years were minimal. There were no difficulties, prewar, in procuring magnesium and thus no savings in procurement costs. The saving in financing charges was very small; prompt progress payments would have reimbursed plaintiff, without delay, for costs of commercially procured magnesium.

Dollar sales in the 3 years prior to the review years included the value of magnesium purchased by plaintiff. Unless the claimed adjustment is made, dollar sales in the 3 review years will not include an average of the almost $1–2 million annually in GFM values. The prewar period is in fact selected, herein, as the base, or normal, peacetime period whose sales and profits are to be compared with sales and profits in the review years, for purposes of the determination of the reasonableness of plaintiff's profits. Base-period sales and profit margins, computed on the basis of the inclusion of values of furnished magnesium, are obviously not comparable to review-year sales and profits which exclude such a valuable component.

The foregoing are strong reasons for inclusion of GFM values in review-period sales. The case against the adjustment is rested by the Government on a handling cost paid to plaintiff to replace the profit plaintiff would have made had it procured the magnesium, as it did in earlier years. If, as the Government says, profits were adjusted, as magnesium began to be supplied, so that the supply should not diminish plaintiff's profits, then that is all the more reason sales should be increased by the value of the magnesium for purposes of comparison with sales in the base period. For otherwise the profit rates would be computed from sales which excluded magnesium values and profits which included profits attributable to sales, including magnesium values, and the resultant rate would be a distortion.

The addition of GFM values to sales has been the subject of several opinions of this court. Major Coat Co., supra, 211 Ct.Cl. at 15–22, 543 F.2d at 105–09; Camel Mfg. Co. v. United States, 215 Ct.Cl. 460, 485–88, 572 F.2d 280, 293–95 (1978); Page-River-Curran v. United States, supra, 216 Ct.Cl. at 254, 574 F.2d at 1066; Blue Bell, Inc., supra, 213 Ct.Cl. at 450–54, 556 F.2d at 1124–26. On

the facts of the instant case, the most applicable of the decisions is *Blue Bell, 'Inc., supra,* in which the court added GFM values to military sales for comparison with civilian sales of products for which the contractor furnished materials.

Review year sales will be increased, by the values of GFM magnesium, for purposes of comparison between sales and rate of profit in the base period and the review period. Dollar profits remain unaffected; only the ratio of profits to sales is changed.

6. *Reasonableness of Costs and Profits.* The factor of "reasonableness of costs and profits" is in the Act stated as having "particular regard to volume of production, normal earnings, and comparison of war and peacetime products." Renegotiation Act, § 103(e), 50 U.S.C.App. § 1213(e) (1970). Further specification is found in section 1460.10(b) of the Board's regulations. The several relevant elements of reasonableness in statute and regulation, will be separately noted.

*The "Base" Period Representing Normal Earnings.* Normal earnings are herein determined to be the earnings in 1964–66, the 3 years immediately preceding the years under review. Such choice conforms with a practice so frequent as to be regarded as "venerable". *Mills Mfg. Corp., supra,* 215 Ct.Cl. at 550, 571 F.2d at 1169. *See also Gibraltar Mfg. Co. v. United States,* 212 Ct.Cl. 226, 234–35, 546 F.2d 386, 391 (1976). Accordingly, the 10.4 percent rate of profit on sales in the period 1964–66 will be compared with the earnings in the review years. Here the choice of period is made; actual comparisons will be made below.

The choice of 1964–66 as the base period in this case was deemed appropriate by the Government's expert witness, an economist, whose testimony on this and other issues seemed sound and was accepted as credible. Management, labor force, material costs as a percent of sales, production processes and production were the same in both base period and review years, except of course for the changes directly associated with the volume of production in the war, review years. The increase in volume, alone, does not pre-

clude the use of the base period as a "profile of profit normalcy." *Gibraltar Mfg. Co., supra,* 212 Ct.Cl. at 235, 546 F.2d at 391.

Products were only superficially different and essentially the same in the base-period years and in the review years. For instance, the Mark 24 parachute flare was produced in sufficient amount in 1966, the first year of its production, to make the base period, over all, comparable to the review years, in which Mark 24 production predominated. While in most years some products were dropped and others substituted, all were essentially the same in composition and manufacturing process. Indeed a constant shift in numbers of products whose individual volume was small in amount may be said to be a characteristic of the entire period of both base and review years, confirming the comparability of the first three of the years with the second three.

Some differences between the two periods cancel each other out. Thus while risks might be said to have increased by reason of the greater volume of combustible materials on hand, the increase in volume led to greater profits, greater surpluses and greater liquidity, a condition of decreased risks.

The Government proposes that base-period profits be compared with the average profit for the 3 review years. The Act requires, however, that renegotiation take place for separate and distinct years. Comparisons will therefore be made between the base period years and each review year. Renegotiation Act § 105(a), 50 U.S.C.App. § 1215(a) (Supp. V, 1975); Regulations, § 1457.1(b); *Mills Mfg. Corp., supra,* 215 Ct.Cl. at 551 n.5, 571 F.2d at 1169 n.5. There is no suggestion in the record of "deficient profits on renegotiable sales in a year * * * prior to that under review" which under the regulations might warrant favorable consideration of otherwise excessive profits in the review year. Regulations, § 1460.10(b)(5).

The only respectably grounded objection by the plaintiff to the choice of 1964–66 as the base period is that the third year of the period, 1966, was already a partial wartime year and was a year of a boom in business

in which sales went to $12.2 million from the prior year's total of $3.8 million. It is true that there are dissimilarities as between 1964–65 on the one hand and 1966 on the other. Sales went up sharply in 1966, as did return on average net worth, but not the rate of profit on sales. The explanation is of course the increase in volume, and profits, which occasions the present inquiry. But the grouping of 1966, in reality a war year, with the peacetime years of 1964 and 1965 all the more produces a "normal" base period. It is worth repeating that the only essential difference between the two periods is the increase in volume.

Finally, any objection to the inclusion of 1966 in the base period, would seem to be met by the beneficial consequence for the plaintiff. The inclusion of 1966 in the base period favors the plaintiff in that the jump in profits in 1966 increases the base period profits and profit ratio against which review year profits and profit ratios are to be scrutinized for excessiveness.

*An Alleged Freedom From Comparisons.* Plaintiff's main objection to the choice of the years 1964–66 as the base period is that the pyrotechnic business is "cyclical," with small profits in peacetime and large profits in wartime; that plaintiff counts on the larger profits in wartime, and thus that it should be allowed to keep those profits without reduction.

The argument is self-serving in the extreme. Plaintiff's expert witnesses went so far as to say that the rate of profit in peacetime alone would not serve to induce plaintiff to stay in business. Surely a good enough inducement for plaintiff to stay in business in the peacetime years of 1964 and 1965, with knowledge that the Renegotiation Act was on the statute books, were the profits in those years: a 10.8 percent average profit in sales, and a 38 percent and 28 percent respective increase, in the two years, in average net worth. Plaintiff's true profit expectations are rather illuminated by its practice of bidding with the objective or realizing a 12 percent profit. The contractor's profit objective may in some circumstances be a significant indica-

tor of what is a reasonable profit. *Cf. Page-River-Curran, supra,* 216 Ct.Cl. at 279–85, slip op. at 31–36, reported in part, 574 F.2d 1063.

No amount of expectations can halt the operation of the Renegotiation Act and the renegotiation clause in plaintiff's contracts. The firmness of the Congressional intention that renegotiation not be evaded may be seen from the unusual statutory phenomenon that Congress in the Renegotiation Act both directed the inclusion of a renegotiation clause in contracts of the designated agencies and also provided that whether or not the direction were observed, contracts should be subject to renegotiation under the Act "in the same manner and to the same extent as if such provisions had been inserted." Section 104, Renegotiation Act, 50 U.S.C.App. § 1214 (1970).

*Comparisons of profits of other contractors.* "Comparisons will be made * * * with the current costs and profits of other contractors, if such information is available." Regulations, § 1460.10(b)(1). The required information is not available. The data in the record as to profits of other pyrotechnic producers is too sparse and is in any event undependable. Those other producers were as much or as little the beneficiaries of wartime inflated profits as was the plaintiff itself.

■ Plaintiff's expert witnesses on trial urged, among other things, a comparison of plaintiff's profits with the profits of the entire chemical industry or a group of chemical companies selected by the experts as comparable. A comparison with the entire chemical industry is hardly to be taken seriously. Equally out of the question is any use of profit statistics for manufacturing companies generally or for any other such broad groups, whether their source be the Internal Revenue Service or the Federal Trade Commission. All such industry averages include the efficient and inefficient companies, the successful and unsuccessful. The suggested comparison with the selected group of companies is rejected for a number of reasons, led by the result-oriented selection, the size of those selected—larger than

plaintiff—and their total dissimilarity of products. It is not known, too, whether such companies were efficient or inefficient. A comparison with unlike companies is of no use in the determination of reasonableness or excessiveness of profits. *Butkin Precision Mfg. Co., supra*, 211 Ct.Cl. at 116–19, 544 F.2d at 503–04; *Manufacturers Service Co., supra*, 217 Ct.Cl. at ——, 582 F.2d at 571–73.

In this connection it ought to be added that generally speaking, the expert economic testimony offered by the plaintiff was entirely unpersuasive. Comparisons based on bonds, public utilities, the vague investing public, carefully selected chemical companies, censuses of dissimilar corporations and the like are too far afield from the comparisons appropriate under the Act. Far-fetched conclusions from carefully selected data would be more appropriate if presented as advocacy by counsel. As such, they could then be accepted in part, to the extent of their factual basis, without the stigma of hyperbole posing as expertise. The Government's expert testimony, which did commend itself, had the virtues of simplicity, understandability and relevance. It was persuasively based on the understandable data of the plaintiff's prewar production and profits, together with the facts of the wartime review years.

*"Comparison of war and peacetime products,"* § 103(e), 50 U.S.C.App. § 1213(e). This is not a case of a sudden conversion of production, on a declaration of war, from lipsticks to cartridges. The pyrotechnics produced for the military changed from year to year, as new products were developed and replaced others, but as already noted, there was no special change from peace to wartime. Nor were peacetime, nonrenegotiable goods sacrificed to the need to produce war items; sales of nonrenegotiable items remained steady and even rose a little; their average was $1.3 million annually in the base period and $1.5 annually in 1967–69.

*Comparisons with profits on nonrenegotiable goods. Regulations, § 1460:10(b)(2).* Profits on plaintiff's nonrenegotiable sales, while fluctuating, have been higher than renegotiable profits, in both peace and war. In the three base period years, profits ranged from 17 to 26 percent, with an average of 22.2 percent. In the review period, the range was 16 to 28, with an average of 21.5. There is no reason that this higher level of nonrenegotiable profits than renegotiable profits should have any effect on the questions presently posed for decision. The mix of products is substantially different, as between renegotiable and nonrenegotiable goods. The nonrenegotiable item produced in largest volume was paper caps for toy pistols. Only half the nonrenegotiable production consisted of pyrotechnic products.

*Costs.* "Comparisons will be made with the contractors own costs * * *." Regulations, § 1460.10(b)(1). Plaintiff's costs were consistently lower than those of others producing the same items, and its prices to the Government reflected these lower costs. For its ability to control costs and sell a large volume of goods to the Government at substantially lower costs than others, plaintiff is entitled to considerable recognition in the amount of profit it is permitted to retain as reasonable and nonexcessive. Regulations, §§ 1460.8(a), 1460.10(b)(1); *Butkin Precision Mfg. Co., supra*, 211 Ct.Cl. at 123, 544 F.2d at 506.

*Volume, Costs and Profits.* From base to review years, sales increased more than threefold, from an average of $6.5 million in the base period to $18.3 million in 1967, $14.7 million 1968 and $23.4 million in 1969. The increase in sales—with the consequent increase in profits from an average of $.7 million annually in the base period to $2.5 million in 1967, $2.1 million in 1968 and $2.7 million in 1969—came from substantially one source—the increased demand whose source was war. The increase in profit rates—from 10.4 percent in the base period to 13.8, 14.1 and 11.7 percent in the review years—came about from the familiar phenomenon that as volume goes up, unit costs go down. As the volume of the three wartime shifts went up, profits rose absolutely. As volume went up, controllable costs went

down and profit rates rose significantly despite the wage differential of 10–15 cents per hour paid to workers on the second and third shifts.

The effect of volume on costs may be seen from the decline, as volume went up, in indirect manufacturing expenses and direct labor expense as percentages of the costs of goods sold. Average indirect manufacturing expense was 17.4 percent of cost of goods sold in the base period, and declined to 13.1, 16.7 and 15.7 percent in the review years. Average direct labor expense as a percentage of cost of goods sold was 7.0 percent in the base period and declined to 5.5, 5.9 and 6.3 percent in the review years.

*Profit on Increased Volume.* Volume of production is mentioned in the statutory text as a primary element to be considered in connection with the factor of reasonableness of costs and profits. 50 U.S.C.App. § 1213(e)(1) (1970). The direction that credit be given for volume is repeated in the regulations: "Favorable consideration will be given to an increase in volume of production for defense purposes." Regulations, § 1460.10(b)(3). Plaintiff's entitlement to favorable consideration for the wartime increase in the volume of its production has already been noted.

Nonetheless, following immediately upon the direction in the regulations to give favorable consideration to an increase in defense production, is the statement of the principle that increases in wartime profits from increases in volume are to be shared with the Government (Regulations, § 1460.-10(b)(3)):

> On the other hand, when the Government's demand has enabled the contractor to increase his sales without exceptional effort and without corresponding increases in costs, decreased unit costs result, and the Government should normally get the principal benefit in more favorable prices, or in renegotiation. In many cases, the contractor may establish that factors related to the increased volume, such as developmental contribution, added risk assumed, or added investment

of capital, entitle the contractor to claim a larger share of the benefit resulting from increased volume, but to the extent that this is not shown, the margin of profit on expanded renegotiable sales should be adjusted in reasonable relationship to the expanded volume. 32 C.F.R. § 1460.10(b)(3).

An increase in volume and profits due to war, ordinarily and in the absence of the considerations noted in the quoted regulation, thus calls for favorable consideration of the contractor for his increase in volume and, simultaneously, for the sharing of his profit with the government. *Mason & Hanger-Silas Mason Co. v. United States*, 207 Ct.Cl. 106, 141, 518 F.2d 1341, 1362 (1975).

The record shows no such "developmental contribution, added risk assumed, or added investment of capital," no such increased efficiency or reduced prices as would entitle plaintiff under the quoted regulation "to claim a larger share of the benefit resulting from the increased volume." Regulations, § 1460.10(b)(3), *supra*; *Mills Mfg. Corp.*, *supra*, 215 Ct.Cl. at 558–564, 571 F.2d at 1173–76; *Manufacturers Service Co., supra*, 217 Ct.Cl. at ——, 582 F.2d at 574–75. On the record, the cause of the increase in volume was simply the increase in the Government's demand, and it was met, simply albeit commendably, by the institution of a second and third shift. And the increase in volume of units produced carried with it, inevitably, an increase in profit. Evidence that the rate of profit may have had erratic correlation with increases and decreases of volume in production of individual pyrotechnic items does not overcome the evidence, vividly to be seen in the data table, that as the number of units produced went up, profits increased in proportion. In the three review years even the rate of profit went up, from 10 percent to 12–14 percent. It follows that "the margin of profit on expanded renegotiable sales should be adjusted in reasonable relationship to the expanded volume." Regulations, § 1460.10(b)(3), *supra*; *Mason & Hanger-Silas Mason Co., supra*, 207 Ct.Cl. at

142–43, 518 F.2d at 1363. How much, remains to be determined.

*Competition.* The pyrotechnic market was in the period of the Vietnam War much like the parachute market described in *Mills Mfg. Corp., supra*, 215 Ct.Cl. at 544–50, 571 F.2d at 1166–69. Despite numerous entrants into the pyrotechnic business, plaintiff and the other producers were overloaded with government orders, to such an extent as to delay deliveries even from plaintiff's 3-shift factory. Such conditions are almost the definition of the market dislocation which makes the resulting profits suspect as excessive under the Renegotiation Act. *Mills Mfg. Corp., supra*, 215 Ct.Cl. 546–49, 571 F.2d at 1167–68; *A. C. Ball Co., supra*, 209 Ct.Cl. at 260, 531 F.2d at 1014.

The intention of the Renegotiation Act is to recoup for the government that part of the profit on war and defense government contracting derived not from the merits of the contractor's production but from the market dislocation brought about by war and defense procurement; in a word, the elimination of profiteering. *Mills Mfg. Corp., supra*, 215 Ct.Cl. at 546–49, 571 F.2d at 1167–68; *A. C. Ball Co., supra*, 209 Ct.Cl. at 260, 531 F.2d at 1014. Thus it is said that the ultimate objective of renegotiation is the approximation of a "competitive norm." *Mills Mfg. Corp., supra*, 215 Ct.Cl. at 545, 571 F.2d at 1166. The state of competition prevailing in plaintiff's market in the years under review is therefore of major significance in the consideration of reasonableness of costs and profits. *Major Coat Co., supra*, 211 Ct.Cl. at 23–28, 543 F.2d at 110–13.

A most patent condition of lessened competition prevailed for a large part of plaintiff's business. Plaintiff's largest single contract of the review period, a $13 million contract for the Mark 24 parachute flare, plaintiff's leading product, came to plaintiff as a member of a "mobilization base" of three producers. The "mobilization base" system guaranteed contracts for the producers included. Under the authority to procure by negotiation in 10 U.S.C. § 2304(a)(16) (1976), three producers were selected by the military authorities, and each was awarded a contract, in the interest of cultivating a source of supply. *See* ASPR § 3–216, 32 C.F.R. § 3–216 (1976). The size of the contract received would vary according to plant capacity and unit price quoted by the producer, but each of the three was assured of getting a contract for at least the output of one shift.

While plaintiff's prices for the parachute flare and others were invariably lower than those of its competitors, more than a third of plaintiff's wartime contracts—$18.5 million in sales or 36 percent of its total sales in the 3 review years—came to it under conditions of lessened competition. The largest part of the $18.5 million was represented by the $13 million contract for Mark 24 flares just mentioned. Almost $4 million consisted of sole source contracts and the remainder was the value of contracts in which plaintiff was the sole bidder.

It is said on behalf of plaintiff that it was competitive because its contracts were firm, fixed-price contracts. This contention has been laid to rest by *Mills Mfg. Corp., supra*, 215 Ct.Cl. at 545, 571 F.2d at 1166. And it may be added that all or most of plaintiff's contracts were awarded by negotiation, a method of procurement which may be necessary and desirable but cannot be as competitive as advertisement and bids. Negotiation proceeds from a base of estimated costs of performance and an estimated profit on the estimated costs. The evidence is that the plaintiff's practice was to include in the elements of its bid 12 percent for profit. Profits, as has been seen, turned out to be at least a bit more. It need not be said that plaintiff was guaranteed a profit on all its contracts. But it surely can be said that plaintiff earned profits at the same or greater rate than previously, on a vastly increased production under wartime conditions of appreciably lessened competition.

The substantial consideration to which plaintiff is entitled for its efficiency, cost and price control does not lessen the likelihood of excessive profits from the general lessening of competition in the entire industry and the substantially entire elimination

of competition in the sales of its parachute flares, in a time of greatly increased wartime demand. Such increased profits on increased volume of wartime contracts awarded in noncompetitive conditions are presumptively excessive, subject as always to consideration of the statutory factors other than reasonableness of costs and profits. *Mills Mfg. Corp., supra,* 215 Ct.Cl. at 547–48, 571 F.2d at 1167–68; *Mason & Hanger-Silas Mason Co., supra,* 207 Ct.Cl. at 141–43, 518 F.2d at 1362–63; *Major Coat Co., supra,* 211 Ct.Cl. at 23–24, 543 F.2d at 110.

*Presumptive Excessive Profits.* It is established above that the increase in volume due to increased wartime Government demand, in conditions of lessened competition, without the compensating factors mentioned in section 1460 of the Regulations, warrants in plaintiff's case an adjustment in the profit rate downward. It follows that the permissible profit margin to be applied in the review years becomes less than 10.4 percent, the base period average return. The Government's expert witness, however, felt the reasonable rate for each of the review years was 10.4 percent; this after consideration of all the "economic" statutory factors, by which he meant to exclude character of business and contribution to the defense effort. Discounting his testimony only slightly, it supports the determination, to this point in the analysis in this opinion, that 10.4 percent is a reasonable rate of return on sales, on the factor of reasonableness of costs and profits alone. Consideration of efficiency and cost control is for the moment postponed. The application of the base period profit rate, 10.4 percent on sales, to review year sales of $18,305,000, $14,674,000 and $23,390,000 produces, on the one statutory factor now under discussion, presumptively excessive profits, to be shared with the Government, of $619,000 in 1967, $545,000 in 1968, $298,000 in 1969.

The second conventional method of estimating profitability—return on net worth—is fairly used to indicate excessiveness to the extent a business is capital intensive. *Mills Mfg. Corp., supra,* 215 Ct.Cl. at 557–58, 571 F.2d at 1173; *cf. A. C. Ball Co., supra,* 209 Ct.Cl. at 256, 531 F.2d at 1011. Plaintiff's business is manufacturing with machinery and its plant comprises 88 specially designed buildings on 300 acres. The business may be said to be capital intensive to a degree sufficient to make return on net worth of relevance on the issues presented.

The Government suggests that the average net worth in the review years be used for the comparison, but the suggestion is unacceptable. The statute commands that each year is separately to be scrutinized for excessiveness. Renegotiation Act, § 105(a), 50 U.S.C.App. § 1215(a) (1970); Regulations, § 1457.1(b); *Mills Mfg. Corp., supra,* 215 Ct.Cl. at 551 n.5, 571 F.2d at 1169 n.5.

The rates of return on net worth in the review years were: 1967—81.1 percent; 1968—46.9 percent and 1969—48.8 percent. All these rates were higher than the average rate of return on net worth in the base period—43.9 percent. Application of the base period average profit on average net worth to the average net worth in each of the 3 review years of $3,111,000, $4,413,000 and $5,589,000 shows profits in excess of 43.9 percent of $1,157,000 in 1967, $134,000 in 1968 and $276,000 in 1969.

The sharp degree of difference between the 43.9 average return in the base period and the 81.1 return in 1967 indicates that profits in 1967, at least, were considerably excessive. While the years 1968 and 1969 saw returns on net worth—of 46.9 and 48.8 percent—only minimally greater than the average of 43.9 percent in the base period, this alone does not clear those years of presumptive excessiveness of profits. For one thing, the absolute increase in dollar profits, aside from any increase in rate, is as much to be shared with the Government when the increase in profit is measured by return on net worth as it is when the increase is measured by profit on sales. Further, net worth in 1968 and 1969 was swollen by the amount produced for surplus by the remarkable 81 percent return on net worth in 1967. The 81 percent return of $2.5 million on net worth of $3.1 million in 1967, were it reduced to a return of 43.9

percent, would have reduced profit by $1.1 million from $2.5 million to $1.4 million. Such a reduction in profit in 1967 would have reduced net worth in the following year, 1968, by $1.1 million from $4.3 million to $3.2 million, on which the 1968 profit of $2.0 million would have been a still-presumptively-excessive 61 percent return. These are extremely rough calculations but they do demonstrate that returns on net worth may be more persuasive of excessiveness over a period of several review years than over a period of one review year.

A cross-check on this conclusion is the substantial coincidence of amount of the 3-review-year total of profits on sales in excess of the rate of 10.4 percent—$1.46 million—and of the 3-review-year total of returns on average net worth in excess of 43.9 percent—$1.57 million. The larger return on net worth in 1967 than in 1968 and 1969 was, so to speak, simply up front in time, in the 3 years, and its great addition to capital surplus operated to reduce the percentage rate thereafter to points only minimally in excess of the base-period average and even less than the return in 1966, the last base-period year.

The caution has been expressed that high sales are not to be used to effect a penalty in the case of a contractor with a low net worth. *Butkin Precision Mfg. Corp., supra,* 211 Ct.Cl. at 126, 544 F.2d at 508. But there is no reason to withhold a determination of unreasonable profits in a case of high sales, from a heightened demand in time of war, without compensating facts, which produce excessive profits measured by profit rates on both sales and net worth.

Both measures of profit—profit on sales and return on net worth—have been shown to have some validity in plaintiff's case. Both give essentially the same results, over the 3 year period under study. A consideration of both the rate of return on sales and the rate on net worth, as compared with base period returns, leaves the conviction that unreasonable profits were made in all 3 review years, with the largest amount of excessive profits found in the first of the three.

In the interest of giving effect to both measures of profit, the results are averaged as follows:

| | 1967 | 1968 | 1969 |
|---|---|---|---|
| Return on sales in excess of 10.4% | $ 619,000 | $ 545,000 | $ 297,000 |
| Return on average net worth in excess of 43.9% | + 1,157,000 | +134,000 | +276,000 |
| | $1,776,000 | $ 679,000 | $ 573,000 |
| divided by 2, equals | $ 888,000 | $ 340,000 | $ 287,000 |

■ These last sums are taken as the amounts of presumptively excessive profit to be further refined. Efforts are thus indicated, and will now be attempted, to merge the effect of all the statutory factors. How much of profit in excess of normal earnings is to be found excessive under the Act requires consideration of all the statutory factors together. *Gibraltar Mfg. Co., supra,* 212 Ct.Cl. at 235, 546 F.2d at 391; *A. C. Ball Co., supra,* 209 Ct.Cl. at 232, 531 F.2d at 998.

■ *The Several Factors Considered Together.* In respect of character of business, risk and contribution to national defense, plaintiff is entitled to modest credit. The most weighty of the factors supporting a larger reasonable profit on the record in this case are the factors of volume, efficiency and the sub-factor of low costs. *Aero Spacelines, Inc., supra,* 208 Ct.Cl. at 746, 530 F.2d at 349; *Camel Mfg. Co., supra,* 215 Ct.Cl. at 500, 572 F.2d at 302. Production for war in volume at low cost and low prices is as much a goal of the Renegotiation Act as is elimination of excessive profits. 50 U.S.C.App. § 1211 (1970); *Mason & Hanger-Silas Mason Co., supra,* 207 Ct.Cl. at 143, 518 F.2d at 1363. For its high efficiency and volume of production, for its low costs and prices, plaintiff is entitled to very substantial consideration. *Mills Mfg. Corp., supra,* 215 Ct.Cl. at 561, 571 F.2d at 1175.

As often in renegotiation cases, it is impossible precisely to measure and state the amount of profits, otherwise excessive, which a contractor should be permitted to keep in compensation for his creditable showing in respect of the various statutory factors. *Manufacturers Service Co., supra,* 217 Ct.Cl. at ——, 582 F.2d at 573. Where

precise quantification is impossible, as it is in this case, and perhaps in all cases, lump sums in one form or another must be allotted. Such allotments must therefore be attempted without apology for the lack of precision.

The starting point is that plaintiff's profits were presumptively excessive, in the 3 review years, by the respective sums of $888,000, $340,000 and $287,000. At least one-third of plaintiff's business came to it without any competition to speak of. Competition in one-third of plaintiff's business was substantially done away with by the mobilization base system and the sole source contracts described above. The remaining two-thirds of plaintiff's business came to plaintiff by reason of the general dislocation in pyrotechnic market competition by reason of the Vietnam War. *Aero Spacelines, Inc., supra.*

As a first step towards final determination of the amount of excessive profits, the foregoing amounts of presumptively excessive profits—$888,000, $340,000 and $287,000—will be divided into two fractional parts—$\frac{2}{3}$ and $\frac{1}{3}$—paralleling the two parts of plaintiff's business divided by types of lessened competition. The two-thirds part, earned in the setting of highly imperfect competition, will first be considered. Half of each of the three amounts of presumptively excessive profits is relinquished to plaintiff in consideration of its efficiency, high volume and low costs. A further one-quarter will be relinquished to plaintiff in consideration of its risks, its contribution to national defense and such credit as is its due under factors other than reasonableness of costs and profits. The remaining quarter is determined to be excessive—the Government's share of the increased profit from increased volume by reason of war.

The second part of plaintiff's profits as here divided—the one-third of the presumptively excessive profits earned under the mobilization base system—is divided as follows. Half will be relinquished to plaintiff in consideration of the credit due it in respect of *all* the statutory factors, and half is determined to be excessive—the Government's share of the increased profit from war.

Excessive profits are thus 25 percent of 66$\frac{2}{3}$ percent, or 16$\frac{2}{3}$ percent, of the presumptively excessive profits, plus 50 percent of 33$\frac{1}{3}$ percent, or 16$\frac{2}{3}$ percent, the total amounting to 33$\frac{1}{3}$ percent of the presumptively excessive profits:

| | 1967 | 1968 | 1969 |
|---|---|---|---|
| Presumptively excessive profits | $ 888,000 | 340,000 | 287,000 |
| 33 1/3% thereof | 296,000 | 113,333 | 95,667 |

These last amounts, rounded off to the nearest $5,000, are $295,000, $115,000 and $95,000, and are determined to be excessive profits of the plaintiff within the meaning of the Renegotiation Act of 1951, as amended, in the respective review years of 1967, 1968 and 1969, less appropriate deductions and credits for state and federal tax, plus interest thereon as provided by law.

## CONCLUSION OF LAW

Upon the findings and foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court determines that for plaintiff's fiscal years 1967, 1968, and 1969, plaintiff realized excessive profits in the amounts of $295,000, $115,000, and $95,000, respectively, a total of $505,000, from contracts and subcontracts subject to renegotiation under the Renegotiation Act of 1951, as amended, these amounts to be decreased by appropriate tax credits and increased by interest allowed by law. Plaintiff having already paid to defendant the sum of $979,031.45, computed on the determination of excessive profits by the Renegotiation Board, in lieu of posting a bond to stay the execution of the Renegotiation Board's order, in accordance with the provisions of Section 1218 of Title 50, U.S.C. Appendix, plaintiff is entitled to a refund from defendant of the difference between said $979,031.45 and $505,000, less appropriate tax credits plus interest as provided by law, together with interest on said difference from the date of collection by the govenment to the date of refund. The case is returned to the Trial Division under Rule 131(c) for computation of such amounts.