GIBRALTAR MANUFACTURING
COMPANY

v.

The UNITED STATES.

Nos. 597–71, 364–72.

United States Court of Claims.

Dec. 15, 1976.

Walter A. I. Wilson, Washington, D. C., for plaintiff. John T. Koehler, Washington, D. C., attorney of record. Hudson, Creyke, Koehler & Tacke, Washington, D. C., of counsel.

Gerald L. Schrader, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before SKELTON, NICHOLAS and KUNZIG, Judges.

## OPINION

PER CURIAM:

These cases, which were consolidated for trial, come before the court on plaintiff's and defendant's exceptions to findings of fact and recommended decision on October 14, 1975, by Trial Judge George Willi, in accordance with Rule 134(h). He redetermined after trial the alleged excessive profits received or accrued by plaintiff during its fiscal years ended June 30, 1967 and June 30, 1968, on defense contracts and subcontracts, under 50 U.S.C. App. §§ 1212–18, as amended.

The case has been submitted on the briefs of the parties and oral argument of counsel. Upon consideration thereof, since the court agrees with the said recommended decision, as hereinafter set forth, with modifications to be explained, it affirms and adopts the said decision, as modified, as the basis for its judgment in this case.

The plaintiff argued orally that the then very recently announced decision of *Butkin Precision Mfg. Corp. v. United States*, 544 F.2d 499, 211 Ct.Cl. —— (1976) mandated a clearance herein. The cases do have similarities. Both involve small industrial concerns specializing in the production of one

or a few difficult component parts of military hardware of the more complex varieties. Both were well managed and efficient, largely because of the unusual skills of the founder and owner. Both had a history of "normal" existence on a thin diet of profit, followed by greatly increased volume and profit during a brief flurry of war demand. Both pose difficulty in fair dealing in renegotiation under the fiscal year method, with danger of tunnel-visioned concentration on profitable years only, in disregard of thin years of preparation and recuperation. We determined that *Butkin* was entitled to a clearance, using the thin prewar years as a base period of "normal" earnings but with very substantial upward adjustment in allowable profit expressly required by statute and regulation. We held, alternatively, that defendant failed in its burden of proof because of its failure to quantify or "cap" a demonstrated "contribution" that could have warranted a clearance all by itself, or with other favorable factor considerations. Plaintiff here does not fare so well. With a similar thin "starting point" it has not demonstrated its right to factor adjustment of such magnitude. Comparison of the factor analysis in this opinion with that will exemplify the statement. Defendant at the least of it has carried its burden of proof that excessive profits were realized in some substantial amount, equalling or exceeding for each year the minimum $40,000 determination prescribed in RBR § 1460.5(a).

■ The difficulty is to fix figures, as we must, with the "abouts" and "approximatelys" left off. Comparisons here are not very helpful. Those tendered by plaintiff, using IRS statistical composites, fail for the same reasons as those tendered by defendant in *Butkin*. About all else that is offered is the excess of other bids, over plaintiff's for items plaintiff supplied. These were unsuccessful bids, generating no awards. The probative value is therefore less than in *Butkin*, where higher bidders were also successful, in the sense that they were awarded subcontracts for the same components *Butkin* supplied, after *Butkin*'s capacity was fully utilized. Such comparisons have much more weight, for many obvious reasons.

■ Plaintiff's pre-award profit estimates of 2.45% to 5% are properly treated as not controlling. Plaintiff refused to allow defendant to verify its figures, which obviously were in the nature of seller's talk. There is no statutory or regulation factor giving weight to that. The defendant's negotiators disregarded it and projected that 10% of cost was a fair amount of profit for plaintiff, which the prices contracted for would allow. In *Mason & Hanger-Silas Mason Co. v. United States*, 518 F.2d 1341, 207 Ct.Cl. 106 (1975), we held that plaintiff there could not avail itself of such expectation to support a higher profit than the court deemed otherwise justified. Nor can defendant use them here.

■ The trial judge inveighed against being asked to render a "jury verdict", in language we leave standing to explain our comment upon it. In *A. C. Ball Co. v. United States*, 531 F.2d 993, 209 Ct.Cl. 223 (1976), we objected to the term "jury verdict" while holding that the broad brush approach there used was appropriate and necessary under the Act. We think that in executing our responsibilities under 50 U.S.C. App. § 1218, it will at times be necessary to select a course among possible alternatives, none of which the evidence obliges us to accept, or to reject. *Cf. Conquerer*, 166 U.S. 110, 131, 17 S.Ct. 510, 41 L.Ed. 937 (1897); and *Meredith Broadcasting Co. v. United States*, 405 F.2d 1214, 186 Ct.Cl. 1 (1968). In choosing among such alternatives, in the Renegotiation context, we may not accord the Board decision a presumption of correctness, or treat it as evidence in support of its conclusion. We do think we may take a sideways glance at it as a mere suggestion. This is what the trial judge did, we think properly. Unfortunately, he appears to have misconstrued the Board decision in some respects, and in making our own, we must look at it through our own eyes, not his.

The trial judge recommended that we adopt the Board's refund amounts $125,000 for fiscal year ending June 30, 1967, and

$475,000 for fiscal year ending June 30, 1968. However, when we examine the Board decision and the one recommended for us, we observe a discrepancy which may be summarized as follows:

| Fiscal year ending June 30, 1967: | Board | Trial Judge |
|---|---|---|
| Sales | $2, 735, 338 | $2, 735, 328 |
| Profits | 488, 246 | 415, 356 |
| Percent profits to sales | 17. 8 | 15. 2 |
| Profits to be eliminated | 125, 000 | 125, 000 |
| Adjusted sales | 2, 610, 328 | 2, 610, 328 |
| Adjusted profits | 363, 246 | 290, 356 |
| Percent profits to sales | 13. 9 | 11. 1 |
| Fiscal year ending June 30, 1968: | | |
| Sales | 3, 749, 354 | 3, 749, 354 |
| Profits | 923, 198 | 862, 985 |
| Percent profits to sales | 24. 6 | 23. 0 |
| Profits to be eliminated | 475, 000 | 475, 000 |
| Adjusted sales | 3, 274, 354 | 3, 274, 354 |
| Adjusted profits | 448, 198 | 387, 985 |
| Percent profits to sales | 13. 7 | 11. 8 |

■ In the second line for each year, the trial judge's "Profits" were lower than the Board's because the Board had made salary disallowances which defendant did not insist on and did not obtain here. In some instances restoration of a disallowance may be partially or entirely offset by treating the contractor as a "high cost contractor," but in this case the restoration does not make the costs high enough to have any effect in factor analysis. Defendant believes the high salaries were justified. Logically it would seem that one who wished to follow the Board (as the trial judge did) would wish to leave the contractor with the same retained profit the Board did. This the trial judge's proposed decision does not do. Moreover a portion of Finding 34, which we have modified, asserts that the Board allowed 10.62% of sales for fiscal year 1967, and 10.35% of sales for fiscal year 1968. This apparently reflected the sales without adjustment, but by RBR § 1460.3 the determination should "adjust" the sales by subtracting the excessive profit to be eliminated. We have made the adjustments in our calculations above, with respect to both the Board's decisions and the ones the trial judge proposes.

We conclude on all the evidence that the plaintiff realized excessive profits of $65,000 in its fiscal year 1967, and $375,000 in its fiscal year 1968, both figures before adjustment for State and Federal taxes. This summarizes as follows:

| Fiscal year ending June 30, 1967. | | |
|---|---|---|
| Sales | $2, 735, 328 | |
| Profits | 415, 356 | |
| Percentage of profits to sales | | 15. 2 |
| Profits to be eliminated | 65, 000 | |
| Adjusted sales | 2, 670, 328 | |
| Adjusted profits | 350, 356 | |
| Percentage adjusted profits to adjusted sales | | 13. 1 |
| Fiscal year ending June 30, 1968: | | |
| Sales | $3, 749, 354 | |
| Profits | 862, 985 | |
| Percentage of profits to sales | | 23. 0 |
| Profits to be eliminated | 375, 000 | |
| Adjusted sales | 3, 374, 354 | |
| Adjusted profits | 487, 985 | |
| Percentage adjusted profits to adjusted sales | | 14. 4 |

Differing with the Board, we think that the plaintiff is entitled to a somewhat more favorable ratio of adjusted profit to sales in its fiscal year 1968 because only in the 1967 year it used Government-furnished machinery at a moderate if not nominal rental. The efficiencies resulting from plaintiff's technical innovations were fully realized only in the 1968 year. See Findings 10–14. We agree with the trial judge's opinion and findings respecting plaintiff's performance. They warrant upward adjustment of the retained profits over what the low base period earnings would indicate, to the extent allowed by the Board, and by us.

Accordingly, the court determines as a matter of law that the plaintiff realized excessive profits of $65,000 and $375,000, before adjustment for State and credit for Federal taxes on income, in the fiscal years ended June 30, 1967, and June 30, 1968, respectively.

Since we cannot determine from the record whether plaintiff has paid the Board refunds, or either of them, and since our determination will require new calculations of the State tax adjustment (RBR § 1459.9) and the Federal tax credit (RBR § 1462.1 and ff.), we remand the cases to the trial division for Rule 131(c) proceedings rather than entering a money judgment at this time.

The opinion and findings of the trial judge, as modified by the court, are as follows:

WILLI, Trial Judge:

The Renegotiation Board (the Board) determined that, before allowance for state and federal taxes on income, $125,000 of the

profit earned by plaintiff on its renegotiable business for fiscal year ended June 30, 1967 and $475,000 of the profit earned by it on renegotiable business done in its fiscal year ended June 30, 1968 constituted excessive profits. Plaintiff brought this suit to challenge both of those determinations in their entirety. In turn, the Government contends in this *de novo* proceeding that a preponderance of the evidence demonstrates that plaintiff's excessive profits amounted to not less than $275,000 and $525,000 for the first and second years in suit, respectively.

This case is factually unique in that plaintiff has always specialized in exactly the same activity that generated all of its renegotiable revenues for the two years under review, *viz*, the manufacture and sale to the Government of final drive sprockets used for replacement purposes on such off-highway military vehicles as tanks, tank retrievers, gun carriers and personnel carriers.

Since 1961 plaintiff, a Michigan corporation, has conducted its business in its own plant in Port Huron, Michigan. Theretofore, beginning in approximately 1950, the business was located in rented quarters in Detroit.

The fundamentals of manufacturing a sprocket involve the flame-cutting of its rough configuration out of high carbon steel plate followed by a series of machining operations that are interspersed with various closely controlled applications of heat that are absolutely critical to the production of a sprocket of satisfactory machinability and end-product durability. The proper use and application of heat is the most technically complex aspect of the manufacturing process because it requires both an extensive understanding of metallurgy and the mechanical engineering skill necessary to accomplish a precise and efficient introduction of the heat that the me-

tallurgy requires. In both of these areas plaintiff's president, Mr. Harvey Amoe, had outstanding competence.

The preeminence that plaintiff achieved in its specialty was attributable to the exceptional energy and resourcefulness of Mr. Amoe, who personally controlled all aspects of production and sales, assisted by his wife, Kathryn, who, as secretary-treasurer, assumed full responsibility for all recordkeeping and related administrative aspects of the business.

Though there were to dozen or more firms, including such large concerns as Chrysler Corporation, that periodically responded to the Government's solicitations to supply it replacement sprockets, the evidence indicates that there was no potential supplier other than plaintiff who concentrated exclusively on that product line. That fact, coupled with Mr. Amoe's intense industry and great technical capability resulted in plaintiff's invariably being the low responsible bidder and therefore becoming practically the Government's sole supplier of replacement sprockets during the years under review. In that role, plaintiff delivered a product of consistently high quality and, considering the volume demands placed on its productive capacity during the years in suit as a result of Vietnam procurement requirements did so with commendable punctuality.

Characterizing the fundamental concern of the Renegotiation Act of 1951, 50 U.S.C.App. §§ 1211–24 (1970), as amended (Supp. II 1972), as being with the reasonableness of prices rather than profits, plaintiff contends that none of its profits can properly be deemed excessive since all were earned by furnishing the Government a quality product at consistently lower prices than otherwise obtainable by it. Further, plaintiff points to the Armed Services Procurement Regulations [1] (ASPR) as reinforc-

---

1. 32 C.F.R. § 3.806 (1974):

"* * * *   *Cost   profit   and   price relationships.*

"(a) Where products are sold in the open market, costs are not necessarily the controlling factor in establishing a particular seller's

price. Similarly where competition may be ineffective or lacking, estimated costs plus estimated profit are not the only pricing criteria. In some cases, the price appropriately may represent only a part of the seller's cost and include no estimate for profit or fee, as in

ing its conception of the central thrust of the Renegotiation Act.

In response, defendant points to the language of the Renegotiation Act,[2] declaring Congressional policy to be the elimination of "excessive profits", not "unreasonable prices", and to various expressions in the relevant legislative history [3] to convincingly demonstrate that in the statutory context of renegotiation a price cannot be deemed reasonable if it yields the seller an excessive profit. The referenced ASPR does not impugn the validity of that principle in the area of procurement policy. Its message is just that a price does not become a reasonable one for the Government to pay simply because it is thought to yield the seller only a minimal profit. Total price of the end-product is of course the standard of competition in all markets, including those created by Government demand. *Paul v. United States*, 371 U.S. 245, 250–253, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963).

■ Conceding that plaintiff is due some credit in both of the review years for contribution to the defense effort and in the second review year for efficiency, under the so-called statutory factors dealing with those matters [50 U.S.C. App. § 1213(e)(4)], defendant relies basically on a comparison of plaintiff's profit performance in the review years with that of the year immediately preceding them to carry its burden of proving the existence and extent of excessive profits. *Lykes Bros. S.S. Co. v. United States*, 459 F.2d 1393, 1401–1403, 198 Ct.Cl. 312, 327, 330 (1972).

Understandably, in view of the dramatic profit increase in the reviews years, but not persuasively, plaintiff vigorously attempts to discredit the significance of a contractor's past performance in gauging the question of excessive profits for a current period. The question, of course, is not whether the permissible amount of a contractor's present-day profits is to be straitjacketed by his own prior experience but whether that experience is cognizable as a general benchmark from which adjustments appropriate under the various statutory factors are to be made.

Because plaintiff's operations during the review years are distinguishable from those of its entire previous business history only by substantial differences in volume, the selection of a profile of profit normalcy from that earlier history is particularly apt in this instance.

The Act directs that "In determining excessive profits * * * there shall be taken into consideration * * * Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products, * * *." 50 U.S.C. App. § 1213(e)(1). Regarding the relevance of a profitability norm in the contractor's own prior history, the Board's interpretive regulation provides: "Comparison will be made with the contractor's own costs and profits in previous years and with current costs and profits of other contractors,[4] if such information is available." 32 C.F.R.

---

research and development projects where the contractor is willing to share part of the costs in other cases, price may be controlled by competition as set forth in § 3.805–1(a). The objective of the contracting officer shall be to negotiate fair and reasonable prices in which due weight is given to all relevant factors, including those in § 3.101.

"(b) Profit or fee is only one element of price and normally represents a smaller proportion of the total price than do such other estimated elements as labor and material. While the public interest requires that excessive profits be avoided, *the contracting officer should not become so preoccupied with particular elements of a contractor's estimate of cost and profits that the most important consideration, the total price itself, is distorted or diminished in its*

*significance.* Government procurement is concerned primarily with the reasonableness of the price which the Government ultimately pays, and only secondarily with the eventual cost and profit to the contractor." (Emphasis added.)

2. 50 U.S.C.App. § 1211.

3. H.Rep.No. 7, 82d Cong. 2d Sess., pp. 2, 5; 97 Cong.Rec., Part 1, pp. 593, 594, 607, 1344, 1346, 1437.

4. The record herein contains no evidence of the costs or profits of any other contractor shown to be at all functionally comparable to the plaintiff either before or during the review years.

§ 1460.10(b)(1) (1974). Informed observers and practitioners have long recognized the soundness of looking to the contractor's own prior experience as an indication of the starting point to which should be made those adjustments, designated by statute and regulation, necessary to compensate for such differing functional and economic factors as significantly affect profits in the period under review. Senate Hearings on Sec. 403 of Pub.L. 528 (To Amend Title VII of the Revenue Bill of 1943—Renegotiation of Contracts) (1943) at 6; N. H. Jacoby & J. F. Weston, *Profit Standards for Renegotiation*, in Procurement And Profit Renegotiation, (1960) 121, note 19, at 144.

In his testimony, Mr. Amoe affirmatively identified plaintiff's fiscal years ended June 30, 1963, 1964 and 1966 as periods characteristic of normal volume and profits for it. The evidence also shows that, while somewhat more profitable, plaintiff's fiscal year ended June 30, 1965 readily fits into the same pattern of normalcy.

Mrs. Amoe testified that an annual output of 12,000 sprockets would constitute normal volume for plaintiff.

In each of the fiscal years ended June 30, 1963 through June 30, 1966 plaintiff produced 16,094, 15,417, 19,815 and 17,361 sprockets, respectively. Finding 14, *infra*.

For those years plaintiff's pre-tax profits averaged 6.01 percent of sales, ranging from a low of 4.21 percent in fiscal 1964 to a high of 7.57 percent in fiscal 1965. Findings 17, 19, *infra*.

In the first review year, fiscal 1967, output rose to 53,616 sprockets, sales to $2,735,328.44 and pre-tax profit accounted for 15.18 percent of sales. Findings 14, 17, *infra*. Thus, dollar volume and profits for that year rose 188 percent and 545 percent, respectively, over the preceding year.

In the second review year, fiscal 1968, sprocket volume further increased to 58,598 and pre-tax profits to 23.02 percent of sales. Findings 14, 17, *infra*. As contrasted with the 1966 fiscal year, sales increased 295 percent while profits ballooned 1,240 percent.

The evidence is that although plaintiff introduced two major technical innovations during the first review year, both were undergoing trial and error adjustments throughout that year and neither, therefore, served to increase efficiency until the following year. Findings 11–13, *infra*. In all other respects, manufacturing operations were performed in the first review year in the same manner that they had been throughout at least the three immediately preceding years, if not longer. It appears, therefore, that production was trebled in the first review year by resort to multiple work shifts, not by technological advances that increased efficiency. This is reflected by the fact that plaintiff's ratio of direct labor cost to sales revenue showed little or no improvement in the first review year as compared with the next three preceding years. Finding 26, *infra*. Increased volume in that year did, however, yield a significant reduction in the percentage of sales revenue consumed by the burden items of general and administrative expense. Finding 17, *infra*.

Aside from the effect of increased volume on the unit cost of overhead, the evidence indicates that plaintiff's pre-tax profits in the first review year were materially benefited by price increases that it was able to obtain on three of the larger and, consequently, higher-priced sprockets in its product line. Finding 25, *infra*.

In the above circumstances defendant charges that not less than $275,000 of plaintiff's pre-tax profit of $415,355.83 must be considered excessive. That would leave plaintiff with a pre-tax profit of approximately 5.7 percent of sales—a lesser rate of return than it achieved in each of the two previous years and well below the average of the four preceding years. Finding 17, *infra*. To support this view defendant attributes virtually none of plaintiff's profit increase in the first review year to improved efficiency or, except for minimal recognition for contribution to the defense effort, to any other aspect of the so-called statutory factors justifying the retention of additional profits.

■ Although it has long been recognized that, in general, the Government should receive the major benefit of profits attributable to increased volume resulting from its own demand,[5] the Board's own interpretive regulations recognize that the principle is subject to various qualifications. For example, 32 C.F.R. § 1460.10(b)(3) (1974), provides in part:

Favorable consideration will be given to an increase in volume of production for defense purposes. On the other hand, when the Government's demand has enabled the contractor to increase his sales *without exceptional effort* and without corresponding increases in costs, decreased unit costs result, and the Government should normally get the principal benefit in more favorable prices, or in renegotiation. [Emphasis added.]

■ The record is clear that it was only the exceptional effort put forth by Mr. and Mrs. Amoe and plaintiff's entire work force that enabled it to triple its production in the first review year. There is no suggestion that the performance in that year represented anything less than full realization of the maximum potential of its productive facilities.

Contrary to defendant's assertion, plaintiff's performance in the first review year clearly merits the favorable recognition for efficiency that is mandated by the Act. 50 U.S.C. App. § 1213(e). The Board's definitive regulation states [32 C.F.R. § 1460.-9(b)]:

Favorable recognition must be given to the contractor's efficiency in operations, with particular attention to the following:

(1) Quantity of production; for example, in relation to available physical facilities; meeting production schedules * *; maximum use of available production facilities.

(2) Quality of production; for example, maintenance of standards of quality; rejection record; reported mechanical or other difficulties in the use or installation of the product.

\*　\*　\*　\*　\*　\*

■ Equally apparent on the evidence is the fact that plaintiff is due favorable consideration under 50 U.S.C. App. § 1213(e)(5) for the technical complexity that is involved in the successful manufacture of sprockets. The demanding requirements[6] for the heat-treatment necessary to properly harden the sprockets in desired areas, but only in these areas, is clearly illustrative of the type of complexity envisioned by this factor. Also involved is the absolute necessity of machining the sprockets to extremely close tolerances. The pertinent Board regulation provides, in part [32 C.F.R. § 1460.14(b)(1)]:

Consideration will be given to the character of the business of the contractor. The manufacturing contribution will vary with the nature of the product and the degree of skill and precision required in the work performed by the contractor. The relative complexity of the manufacturing technique and the relative integration of the manufacturing process are the basic considerations in evaluating this factor.

The net of the total situation for the first review year is that when assimilated to the relevant statutory criteria, a preponderance of the evidence, including that delineating its own profit experience in times of concededly normal operations, shows that plaintiff did realize some excessive profits. It is equally clear, however, that under the same criteria not all of its profits above 5.7 percent of sales were excessive, as defendant would have it.

The situation is not materially different for the second review year.

■ Again, unless the Renegotiation Act is deemed inapplicable as a matter of

---

5. 97 Cong.Rec., Part 1, pp. 594, 1324 (1951). C. G. Blough, *Renegotiation Standards and Practices*, 10 Law and Contemp.Prob., 276, 298 (1943); J. T. Koehler, *An Imaginary Renegotiation Case—How Statutory Factors Are Applied*, speech delivered to the American Management Association, 1952, reprinted in *The Renegotiation Guide*, (1957), 59, 59–60.

6. Finding 9, *infra*.

law to contractors who typically produce goods of acceptable quality at prices lower than obtainable elsewhere by the Government, a proposition that is insupportable for reasons previously given, some part of the pre-tax profit of $862,984.80 earned by plaintiff in its fiscal year ended June 30, 1968 was clearly excessive. The evidence shows [7] that less than $100,000 of that unprecedented profit resulted from reductions in the unit cost of direct labor that presumably were made possible by technological advances perfected by the close of the preceding year.[8] As in the case of the first review year, it appears that price increases [9] obtained by plaintiff on three of the large-type sprockets in its product line were once again primarily responsible for a rate of return on sales that was more than three times greater than that achieved by plaintiff in f. y. e. June 30, 1965, the best year that it ever had prior to the period under review.

While the technological efficiency factor recognized by defendant for the second review year prompted it to increase the margin of profit to which it agrees plaintiff was entitled, to approximately 9 percent of sales (rather than 5.7, as in the preceding year), it is apparent that it still failed to accord plaintiff all of the favorable consideration due it under the statutory factors. For example, defendant's approach to the second review year makes no allowance for the earnings credit due plaintiff for complexity involved in its manufacturing technique. That factor is equally apposite to both of the review years.

In sum, as to both of the years in suit, the record is entirely adequate to permit an intelligible discernment of a basic standard of profit normalcy for plaintiff's business and to identify those statutory factors entitling it to additional profit allowances for review year operations. The evidence does not, however, provide a tenable basis for separately translating each of the operative factors into a reasonably definite dollar amount. In these circumstances, to invoke the frequently abused expedient of a so-called "jury verdict" to reach a superficially determinate result would be little short of pure sophistry. In its legitimate form a "jury verdict" is not an unqualified license to guess. *Old Colony Bondholders v. New York, N. H. & H. R. Co.*, 161 F.2d 413, 449–451 (2d Cir. 1947) (opinion of Frank, J., dissenting in part). A realistic alternative is provided by the evidence.

Almost half of the sprockets that the Government bought from plaintiff during the two review years, some 43,774 in all, were procured under negotiated contracts that were let because of a lack of bidder interest or of adequate price competition in such bids as were received in response to formal advertising solicitations. 10 U.S.C. § 2304; 32 C.F.R. §§ 1.300–2, 1.300–3 (1974).

As a prerequisite to the issuance of a negotiated contract the ASPR's provide: "Some form of price or cost analysis is required in connection with every negotiated procurement action." 32 C.F.R. § 3.807–2(a) (1974). In advance of each of the negotiated contracts that it received in the review years, therefore, plaintiff submitted a breakdown-type statement of the costs that it expected to incur and the profit that it expected to earn on the contemplated procurement. In these submissions plaintiff variously projected its margin of profit as ranging between 2.45 percent and 5 percent of selling price. On the negotiated contracts as a whole, plaintiff's projected profit margin averaged well under 3.5 percent of selling price. In the course of performance or afterwards it never qualified or rescinded these representations as to its profit expectations. Although Mr. Amoe consistently denied the Government access to plaintiff's plant operations for purposes of verifying the accuracy of its cost projections, the increment of profit was never a subject of contention. In fact, evaluating plaintiff's cost and profit submissions in the

---

7. Finding 26, *infra.*

8. Findings 11–13, 27, *infra.*

9. Finding 27, *infra.*

process of attempting to arrive at an acceptable unit price to be used for an award, the procurement representatives uniformly disregarded plaintiff's profit projections in favor of their own conception of a measure of profit that was fair and equitable recompense for the undertaking involved. They uniformly selected 10 percent of total cost as the proper measure of a fair profit. Finding 24, *infra*. Although the Government was in urgent need of the sprockets covered by the negotiated contracts awarded plaintiff, there is no suggestion in the record that this standard of reasonableness for profits was the product of duress, fraud or mistake, or that for any reason the procuring authority ever, even at trial, came to regard it as excessive.

**WICKHAM CONTRACTING CO., INC.**

v.

**The UNITED STATES.**

No. 327–75.

United States Court of Claims.

Dec. 15, 1976.

