## KAY MANUFACTURING COMPANY

v.

### The UNITED STATES.

#### No. 478–73.

United States Court of Claims.

March 10, 1982.

Earl D. Yaffe, Chicago, Ill., atty. of record, for plaintiff.

Lenore C. Garon, with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG and SMITH, Judges.

## OPINION

KUNZIG, Judge: *

This renegotiation case comes before the court on plaintiff's exceptions to the findings of fact, conclusions of law, and recom-

* This opinion was adopted by the court before Judge Kunzig's death.

mended opinion issued by Trial Judge Yannello on September 29, 1980, in accordance with Rule 134(h).[1] The Trial Judge held that Kay Manufacturing Company (Kay or plaintiff) had realized excessive profits of $111,332 during fiscal year 1969, the review year in issue, from renegotiable subcontracts for the machining of 105–mm. cartridge case bases. Profits earned under these subcontracts were subject to the provisions of the Renegotiation Act of 1951 (the Act), 50 U.S.C.App. §§ 1211–24 (1976 & Supp. III 1979). Plaintiff initially brought this action seeking review of the Renegotiation Board (the Board) finding that Kay had realized excessive profits on its renegotiable subcontracts of $150,000. Defendant claimed at trial that Kay's profits were actually excessive in the amount of $165,128. Plaintiff disputes the conclusions of the Trial Judge, urging in particular that defendant has failed to meet its burden of proof in regard to the claimed excessive profits, and asks that Kay be granted a full clearance by this court. We are indebted to Trial Judge Yannello for her thorough analysis and development of the facts in this case.[2] However, we find that we are unable to concur with her ultimate disposition because of the failure of defendant to meet its well-established burden of proof. We therefore grant a clearance for plaintiff.

## I.

Plaintiff commenced business in 1947 as a small machine shop specializing in the machining of steel forgings. Operating as a family partnership until its incorporation in 1968, Kay Manufacturing was managed almost entirely by Edward Kazmirski, the company's president and only full-time officer. Mr. Kazmirski was a very highly qualified operator of machining tools with outstanding abilities in designing machining equipment and in training operators in their use. Prior to 1967, Kay was engaged in primarily commercial machining for its major customer, Jernberg Forgings Company (Jernberg), and had a markedly smaller volume of sales and profits than in the review year 1969.[3]

Kay became involved in machining work for the government in 1966, when contacted by Jernberg about machining a spiral-wrapped steel cartridge base for the artillery shell used in the 105–mm. howitzer, the main supporting weapon of the United States Artillery at that time. The innovative spiral-wrapped shells, a significant improvement over the earlier drawn steel cartridges,[4] assumed a vital importance to the United States in 1966, when escalation of the Vietnam War created a huge demand for the shells. Kisco Company (Kisco) was at this time the only source for the shells in the United States, having developed the technology for their manufacture over several years. As prime contractor Kisco assembled the shells, using cartridge bases obtained under subcontracts with Jernberg, a forging company, as well as with a number of machining companies. Jernberg, in turn, subcontracted its machining work for the forged steel bases to plaintiff. In 1966, at the time Jernberg began to subcontract with Kisco, the machining technique for the bases was far from perfect and Kisco had been unable to find a suitable source for the base. Through Mr. Kazmirski's modification and retooling of the machining equip-

---

1. Defendant filed no exceptions to the Trial Judge's report.

2. The Trial Judge's findings of fact are not printed with this opinion. Whatever facts we have found important to our decision, however, are included herein.

3. Plaintiff's average volume of sales for the period 1962–65 was $94,195. Profits during these years, after deducting a subsistence salary allowance for the partners (so as more nearly to approximate the later corporate structure) averaged $12,462. This is in comparison to review sales of over $1 million and profits in excess of $300,000.

4. The spiral-wrapped case was considered more reliable than the drawn steel case. In addition, small subcontractors were able to produce component parts of the spiral-wrapped case for assembly by the prime contractor, whereas the drawn steel case required large manufacturers with heavy capital investment in equipment and facilities. Thus, the new base proved significantly less expensive to produce than the drawn steel case.

ment, however, a reliable technique applicable to high volume production of the base was developed and information on this technique was made available to other machining companies.

As subcontractor to Jernberg, Kay received forged steel discs from Jernberg on a consignment basis at no cost. These forgings were then machined by Kay using equipment, much of which was paid for by Jernberg but selected and adapted by Kay managerial personnel. The machining process involved a series of operations on two machines, a chucker and a lathe. Because of the complexity of the operations and the short time interval during which they were performed, machine operators had to have mechanical aptitude and manual dexterity, and were required to complete a two-year training program. Once the machining was done, Kay rust-proofed, packed and shipped the bases directly to Kisco, which then assembled the shells and supplied them to the government.

Jernberg's contract with Kisco in the review year 1969 called for the delivery of fully machined cartridge case bases at the rate of 240,000 per month at a price of $1.155 per unit. Of this, Kay's price per unit to Jernberg for the machining work was $.29, a price which remained constant throughout the period 1967–69. The Jernberg-Kay unit price was the lowest of the five suppliers used by Kisco during 1969. In addition, the Jernberg-Kay team was the only one of Kisco's contractors which was not delinquent in meeting production schedules. It also had the lowest rejection rate of the five.

Kay's renegotiable business in 1969 consisted of machining approximately four million steel forgings, of which some 75% were the 105–mm. cartridge bases.[5] Renegotiable sales for that year were $1,202,125 and Kay realized a profit on these sales of $331,096. This represents a profit-to-sales ratio of 27.54%. After 1969 the government's requirements for cartridge cases dropped sharply and Kay's unit prices declined from $.29 to $.19 over the following four years. This resulted in a steady drop in Kay's profits and a loss for Kay in 1972 and 1973, when the cartridge program terminated. Kay then returned to the commercial market.

The Renegotiation Board reviewed plaintiff's case in 1973 and determined that plaintiff had realized excessive profits for the year 1969 of $150,000.[6] Plaintiff petitioned this court for a redetermination of alleged excessive profits, seeking complete clearance. Defendant claimed that excessive profits actually amounted to $165,128, attempting to support this figure with "comparison evidence" of plaintiff's financial situation in "base years" 1962–65 (a period of commercial activity) and 1970–71 (an allegedly more competitive market in

5. The 105–mm. cartridge bases made up about 70% of Kay's total renegotiable sales in 1969. Scant evidence of the other four items constituting the balance of Kay's renegotiable sales was introduced at trial, and the parties agreed that findings concerning the 105–mm. base would be applied to all of Kay's 1969 renegotiable sales.

6. Plaintiff's sales, profits and profit-to-sales ratio for the five years under consideration by the Board were:

|  | 1967 | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|---|
| Sales | $651,144[1] | $792,802[1] | $1,202,125 | $1,069,150 | $1,382,833 |
| Profits | 248,351 | 242,242 | 331,096[2] | 158,652 | 207,233 |
| % Profits to Sales | 38.14% | 30.56% | 27.54% | 14.84%[3] | 14.99%[3] |

Notes: [1] Sales of less than $1 million in 1967 and 1968 were, by statute, not subject to renegotiation.

[2] In proceedings before the statutory Renegotiation Board, it was determined that renegotiable profits were $310,938, but the parties now agree to a correct figure as shown in the chart above—a difference of about $20,000.

[3] The Board issued a clearance for the years 1970 and 1971.

this area).[7] In addition, the government was willing to allow plaintiff a $20,000 credit under the Act's so-called "statutory factor"[8] considerations, as estimated by the government's expert witness.[9]

After considering the evidence presented at trial, Trial Judge Yannello rejected defendant's attempted comparison, noting that during the earlier period the product mix, sales volume and corporate structure differed markedly from the 1969 situation, and that during the later period the sharp decline in production volume and government demand made comparison with 1969 inapposite. Instead, the Trial Judge substituted alleged comparative evidence developed by altering certain evidence produced by plaintiff in an attempt to prove reasonableness of its profits. On this basis, Trial Judge Yannello determined that Kay had received excessive profits in the amount of $146,332, which figure she reduced by $35,000 as credit under certain of the statutory factors. Thus the final excessive profit figure determined by the Trial Judge was $111,332.

The major thrust of plaintiff's exceptions to the Trial Judge's opinion is that the government has simply failed to meet its burden of proving excessive profits and that the Trial Judge should not be permitted to substitute her own analysis and carry that burden for defendant. Because defendant failed to produce adequate comparative or other evidence to rebut plaintiff's proof that its profits were reasonable, plaintiff argues that it should be cleared by this court. We agree.

## II.

Jurisdiction over contract renegotiation cases was transferred to this court from the United States Tax Court in 1971. Consistent with its procedure of placing the burden of proof on taxpayers in tax cases, the Tax Court required that plaintiffs in renegotiation cases affirmatively demonstrate that their profits were not excessive in order to receive a clearance. This burden of proof rule did not survive the transfer of jurisdiction over such cases to the Court of Claims. In the seminal case of *Lykes Bros. S. S. Co. v. United States*, 198 Ct.Cl. 312, 459 F.2d 1393 (1972) (hereinafter *Lykes Bros.*), the court held that plaintiff would have the initial burden of going forward with the evidence as to the reasonableness of its profits, based on accounting data and certain statutory factors. Thereafter, the burden would switch to defendant to prove by a preponderance of the evidence that plaintiff's profits were excessive and the amount by which they were excessive. *Id.* at 326–27, 459 F.2d at 1401–02. The court noted that this allocation of burdens implemented "Congress' insistence that the trial here is to be de novo and that no presumption attaches to the [Renegotiation] Board's determination." *Id.* at 330, 459 F.2d at 1403.

The nature of defendant's burden of proof was further clarified by this court in *Major Coat Co. v. United States*, 211 Ct.Cl. 1, 543 F.2d 97 (1976) (hereinafter *Major Coat*). In *Major Coat* we stressed the need for the government to provide comparative evidence of the profits of companies similar to plaintiff in order to show that plaintiff's profits were excessive. Because *Major Coat* imposed a stricter standard of proof than had been required previously, we provided that "the court will undertake, however reluctantly, *and for only a limited span of time*, to engage in judgmental adjustments and reworkings of the data placed in

---

**7.** Defendant chose to use the "base years" comparison because it recognized plaintiff was unique in receiving customer furnished materials from Jernberg instead of having to obtain the raw materials on the marketplace as did its competitors.

**8.** The "statutory factors," set out in 50 U.S.C. App. § 1213(e), indicate a number of circumstances that may justify a company's higher level of profits. *See* note 11, *infra*.

**9.** Defendant conceded that Kay was entitled to very favorable consideration, but only under the statutory factors of efficiency of the contractor and reasonableness of costs and prices. The government's expert witness, however, gave no empirical justification for the $20,000 figure.

the record in order to arrive at a finding of a reasonable profit of the renegotiated contractor—where the state of the evidence permits this to be done in a responsible manner, ..." *Id.* at 48, 543 F.2d at 124 (emphasis added). Thus, in a number of cases tried prior to the *Major Coat* decision, we did engage in "judgmental adjustments and reworkings of the data," while at the same time consistently reaffirming the burden of proof allocations first enunciated in *Lykes Bros. See, e.g., Shinn Engineering, Inc. v. United States*, 221 Ct.Cl. 708, 611 F.2d 820 (1979); *Manufacturers Service Co. v. United States*, 217 Ct.Cl. 387, 582 F.2d 561 (1978); *Camel Mfg. Co. v. United States*, 215 Ct.Cl. 460, 572 F.2d 280 (1978); *Blue Bell, Inc. v. United States*, 213 Ct.Cl. 442, 556 F.2d 1118 (1977). The court had no intention, however, of continuing this process indefinitely.

Five years have now passed since this court delineated the contours of defendant's burden of proof in *Major Coat*. The cases have established that the government may meet its burden of providing comparative evidence in any of several ways where appropriate. *Gibraltar Mfg. Co. v. United States*, 212 Ct.Cl. 226, 546 F.2d 386 (1976) (comparison of contractor's performance with his own performance in prior years); *Camel Mfg. Co. v. United States, supra* (comparison of contractor's renegotiable business with his commercial business during the review period); *Major Coat, supra* (comparison of contractor's profits to those of his competitors). The *Lykes Bros.* decision as to allocation of the burden of proof, however, continues to control and has not been attenuated by this court's later leniency in the wake of *Major Coat. See, e.g., Butkin Precision Mfg. Corp. v. United States*, 211 Ct.Cl. 110, 544 F.2d 499 (1976); *Shinn Engineering, supra*, 221 Ct.Cl. at 733–34, 611 F.2d at 834 (Kunzig, *J.*, dissenting).

In sum, under *Lykes Bros.*, plaintiff has the initial burden of establishing its *prima facie* case as to the accuracy of accounting determinations and the justification for the level of its profits under the statutory factors. The burden of proof then switches to the government to show, by comparative or other appropriate evidence, that plaintiff's profits are excessive and by what amount. This comparative showing covers both plaintiff's accounting determinations and the statutory factors under which plaintiff seeks to justify its profits. *Shinn Engineering, supra*, 221 Ct.Cl. at 719, 611 F.2d at 826. We turn now from this brief retracing of the development of burden of proof standards to an application of these standards in the instant case.

### III.

At trial the parties stipulated that plaintiff's renegotiable sales and profits in the review year 1969 were, respectively, $1,202,125 and $331,096, giving it a profit-to-sales ratio of 27.54%.[10] Thus, the accuracy of plaintiff's accounting determinations was not in issue. Instead, plaintiff channelled its efforts into making a *prima facie* showing that its profits were reasonable and that it was entitled to significant credit under the so-called "statutory factors" of 50 U.S.C.App. § 1213(e).[11] As we believe that plaintiff has established its *prima facie* case for reasonableness of profits, we will discuss briefly each factor relied on by plain-

10. For a summary of plaintiff's sales, profits and profit-to-sales ratio for the years 1967–71, *see* note 5, *supra*.

11. The Act provides, in part, that "[i]n determining excessive profits, favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities and manpower." 50 U.S.C. App. § 1213(e). It also establishes as factors

to be considered (listed in the order in which we shall consider them herein):
1. Reasonableness of costs and profits;
2. extent of risk assumed;
3. nature and extent of contractor's contribution to the defense effort;
4. character of the business;
5. net worth and capital employed;
6. other factors (as required by the public interest and fair and equitable dealing).
*Id.*

tiff.[12] The fact that plaintiff may not have convinced this court of its entitlement under every factor does not detract from its establishment of a *prima facie* case for reasonableness of profits, and would assume an importance only in rebutting defendant's proof that profits were excessive. *See Instrument Systems Corp. v. United States*, 212 Ct.Cl. 99, 109, 546 F.2d 357, 362 (1976).

A. *Efficiency.* This factor requires that favorable consideration be given "to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower...." Kay produced in the review year some three million cartridge bases, a 20% increase over its 1968 production rate. Plaintiff contends, and the Trial Judge found, that this high volume production was possible because of innovative tooling, extensive personnel training and careful management, all beyond that expected to be encountered in the general market.

While producing the second-highest volume of cartridge bases for Kisco [13] the Jernberg-Kay team maintained the lowest prices and the lowest rejection rate of all Kisco's subcontractors and were the only subcontractors not delinquent in meeting production schedules. Quality control is particularly important in this industry, plaintiff asserts, because of the risk of injury and death resulting from a defective ammunition product. Jernberg attributed the low rejection rate to an ingenious method developed by company president Kazmirski of checking the forgings at the machine with cleverly designed gauges that made it possible for the operator to stop production of "scrap" [14] at the source and limit the amount of quality-control inspection at the end of the line. This not only reduced scrap, but reduced the cost of inspection as well.

Prior to 1969, Kay had developed specialized tooling known as fixes, which were not generally known throughout the industry. The Trial Judge found that use of this tooling undisputedly improved the quantity and quality of Kay's production. Kay also employed unique machining techniques that controlled the formation of defects and scrap in the bases, and modified much of its equipment to increase production speed while maintaining the close tolerances required for the bases.

In order to meet production schedules in 1969, Kay operated two full-time shifts and one part-time shift, resulting in continuous production 24 hours a day. During this time, Kay employed 50 to 55 employees, with 20 to 25 on a shift. Because the operation of the complex machining equipment required a great deal of skill and the labor pool of such qualified operators was so limited, Kay's management initiated and maintained an intensive operator-training program. This two-year program was administered by one full-time employee. In addition, Mr. Kazmirski dedicated a great deal of his spare time and all of his vacation time in 1969 to ensure that production schedules would be met.

In sum, Kay's efficiency, high quality and quantity of production and low rejection rate, and its development and use of technological innovation in achieving mass production were, as the Trial Judge found and defendant conceded, outstanding and entitle Kay to very favorable consideration.

B. *Reasonableness of Costs and Profits.* As noted above, both the parties and the Trial Judge acknowledged that Kay's costs and prices were considerably lower than its competitors' costs and prices. Kay's unit

---

**12.** No evidence was presented on the factor of "net worth and capital employed" since experts for both parties agreed that this data was not important in evaluating the reasonableness of Kay's profits.

**13.** During 1969, Kisco's base suppliers, besides the Jernberg-Kay team, were Chrysler Corp., Wagner Electric Co., National Acme and F.T.S. Corp. Although Chrysler Corp. supplied the

largest percentage of bases to Kisco (40% in comparison with Jernberg-Kay's 32% share), certain deficiencies in Chrysler's production resulted in a number of substandard bases which were later reworked by Kay at Kisco's request.

**14.** Failure to maintain specified machining tolerances could result in rejection of the base, rendering it "scrap."

price to Jernberg of $.29 remained constant throughout the years 1967–69, in spite of a continuously increasing production rate. The increase in volume, however, did not result in a higher rate of return to Kay in 1969, the highest volume year; instead, the rate of return decreased each year. This result was attributed by plaintiff to the increased need for additional machines and operators because of the high volume production, as well as the higher costs incurred in operating the plant 24 hours a day to meet production schedules.

Because plaintiff's costs and prices were lower than its competitors', the Trial Judge concluded, and we are in accord, that they were reasonable and that plaintiff had thus established its entitlement to favorable consideration under this factor. Defendant's expert witness reached a similar conclusion.

Although both parties recognized that Kay was unique among its competitors in having no materials costs, plaintiff attempted to present comparison evidence to support its contention that its profits were reasonable. Plaintiff's expert witness, Dr. Arthur Burns, added the estimated costs that Kay would have incurred had it obtained its own materials into its cost-of-goods-sold figures and adjusted the sales figures accordingly. This gave Kay a much lower profit ratio, which compared favorably with the profit ratios of manufacturing companies within the industry. Alternatively, Dr. Burns subtracted estimated costs from the cost data of the manufacturing companies and made the necessary adjustments to the sales figures. Again, the resulting profit ratios compared favorably with Kay's.

The Trial Judge proceeded on the theory that comparison with the industry was possible, but altered Dr. Burns' calculations by adding a 10% "mark-up" [15] representing assumed profit on materials, to Kay's profit figures. Alternatively, she subtracted similar figures from the profits of the companies with materials costs. In this way, she

concluded that Kay's profits were somewhat excessive. Plaintiff strenuously objected to the use of the mark-up figure since, by the Trial Judge's own admission, the 10% figure was entirely hypothetical. Plaintiff pointed out that, even assuming a 10% cost mark-up for materials, there was absolutely no evidence as to how much of the mark-up would translate into profit after the increased costs of handling the materials were accounted for. Defendant failed to offer any proof as to what such figures might be. We cannot condone the Trial Judge's approach in attempting to reconstruct a hypothetical comparison, where the burden of that proof is on defendant and must be met with solid evidence. Therefore, we refuse to follow her conclusions as to the reasonableness of plaintiff's profits.

C. *Extent of Risk Assumed.* Plaintiff contends that its profit level was further justified by the risk inherent in performing a firm, fixed-price contract where adherence to close tolerances is required. This element of risk was recognized by this court in *Shinn Engineering, supra,* 221 Ct.Cl. at 721, 611 F.2d at 826–27, as entitling plaintiff to favorable consideration. In addition, plaintiff argues that it was exposed to further risk by the cyclical nature of the defense industry, which often forces a small manufacturer such as Kay to sustain huge losses when the defense program is terminated. Plaintiff asserts that this risk became a reality after 1970, when the government's requirements for the 105–mm. cartridge declined sharply, resulting in price reductions and finally losses to plaintiff in 1972 and 1973, when the program was terminated.

The Trial Judge found, however, that the risks incurred by plaintiff were no greater than those generally encountered in the industry. For one thing, Kay's investments in capital and assets were not subject to risks since much of its equipment and the material involved in its renegotiable busi-

---

**15.** In its exceptions to the Trial Judge's report, plaintiff notes that the Trial Judge used the word "mark-up," generally used to mean the amount added to sales price to reflect both costs and profit, interchangeably with "profit." She apparently added the full "mark-up" figure when she increased plaintiff's profits to reflect the assumed profit on materials.

ness was "customer furnished." More importantly, she noted that Kay's primary commercial customer before 1967 was Jernberg, who also was its exclusive contractor for the renegotiable work. Thus she found no evidence of meaningful risk of loss of commercial business as a result of Kay's participation in the renegotiable business. We agree with the Trial Judge that plaintiff should receive no additional credit under the statutory risk factor.

D. *Contribution to the Defense Effort.* In evaluating plaintiff's entitlement to credit under this factor, the statute requires that consideration be given to "inventive and developmental contribution and cooperation with the government and other contractors in supplying technical assistance." The Trial Judge found Kay entitled to credit under this factor for several reasons.

Plaintiff undertook production of the 105–mm. cartridge base at a time when the government was in urgent need of the cartridges because of escalation of the Vietnam War. Very few companies were willing at this time to undertake the base's manufacture because of the attractiveness of the commercial market. This reluctance is also attributable to the need of companies to obtain and modify machining equipment in order to produce the close tolerance work demanded by the nature of the product. A number of machine shops in the early and mid-1960's had attempted to produce the base and had failed.

Plaintiff was able, through innovative retooling, to reproduce the base successfully, and to meet the government's production schedule with a very low rate of rejections. It provided technological advice and assistance to other government contractors, and made its machining operations known to Kisco, explaining its techniques and placing no restrictions on the disclosure of the information. Finally, Kay assisted the government by reworking a number of substandard bases that had been produced by one of its competitors.

In time of urgent national need, the government is forced to rely on private industry's competence and willingness to produce. Kay has adduced evidence to show that it is entitled to favorable consideration for its contribution to the national defense at this time, and the Trial Judge so found. We agree with this finding.

E. *Character of the Business.* This statutory factor requires the consideration of the "source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over." As mentioned above, Kay had not been involved with the development of the 105–mm. cartridge in the 1950's and 1960's, and first became involved with the production of the base in 1966 under Kay's subcontract with Jernberg. Kay's part in the reproduction process, however, was limited to machining the steel forgings received under consignment from Jernberg and readying them for shipment to Kisco.

Plaintiff argues that it is entitled to favorable consideration under this factor because of the relative complexity of the machining process and the high production volume which complicated manufacture of the base. It particularly points to the difficulty of smoothing and polishing the base, performing three machining operations to very close tolerances, and inspecting the base visually and with gauges within a 30-second time interval. It further notes that the Trial Judge explicitly recognized that a number of companies before Kay had failed in their attempts to produce the base because of the "complexity of the part." Under the authority of *Butkin Precision Mfg. Corp. v. United States*, 211 Ct.Cl. 110, 544 F.2d 499 (1976), therefore, Kay claims favorable consideration for character of its business.

The Trial Judge found that Kay was not engaged in "precision" machining, as was the *Butkin* company, because that term is customarily applied in the industry to machining to tolerances of .001 of an inch, rather than the .002 tolerance with which Kay was required to comply. Thus, she found Kay's operations involved no complex machining technique, and since she had credited Kay under the efficiency factor for the difficulties involved in high volume pro-

duction, the Trial Judge gave plaintiff no credit under this statutory factor. On balance, we agree with the Trial Judge. Although the machining operation required innovative tooling, extensive training of operators and a great deal of management supervision, these considerations have been adequately covered under other statutory factors, and do not demand further credit.

In sum, we find unquestionably that plaintiff, as discussed above, has met its burden of proof for establishing a *prima facie* case under *Lykes Bros.* that its profits were reasonable. Kay has produced a great deal of evidence tending to show that its profits were in a large part the result of innovative machinery retooling and adaptation, specialized employee training, and, particularly, long hours of hard work. Kay further has justified its profits with evidence of a significant contribution to the defense effort through innovations and aid to other government contractors and its efforts to keep its prices well below those of all competitors. This court has previously recognized that plaintiff's burden of establishing a *prima facie* case in a renegotiation case is fairly easy to meet, characterizing it as a requirement that plaintiff "show that it had acted responsibly in invoking the processes of the court, and not just for purposes of delay." *Instrument Systems Corp. v. United States*, 212 Ct.Cl. 99, 108, 546 F.2d 357, 362 (1976). *See also Manufacturers Service Co. v. United States*, 217 Ct.Cl. 387, 582 F.2d 561 (1978) (a function of *prima facie* showing is to prevent undue surprise to government). In contrast, plaintiff in the instant case has made an extraordinarily strong showing that its profits were reasonable, and thus should be granted a clearance unless the government has met its burden of proving the profits excessive.

## IV.

A major feature of this court's holding in *Major Coat* was an emphasis on requiring the defendant, in carrying its burden of proof, to present comparative evidence to determine the reasonableness of plaintiff's profits. The aim of this presentation is to create some sort of normal competitive context in a market situation distorted by the exigencies of the wartime demand, so as to assess plaintiff's profits in comparison with profits in an undistorted situation. Under normal circumstances, defendant is in the better position to produce evidence as to the profits of companies similar to plaintiff, because of defendant's ability to draw on Renegotiation Board files and the records of procuring agencies. In this case, however, plaintiff, in attempting to show that its profits were reasonable, placed into the record certain comparison evidence developed by its expert witness. This evidence, discussed above, indicated that Kay's profits were comparable to those of its competitors, and demanded rebuttal evidence from the party with the burden of proving excessive profits.

Defendant indicated that it disagreed with plaintiff's approach, but rather than developing rebuttal evidence along the lines later used by the Trial Judge, simply asserted that no comparisons between Kay and its competitors were possible because of, *inter alia*, the lack of materials costs.[16] Instead, defendant's expert witness, Dr. Edward Mock, attempted to prove excess profits by comparing plaintiff's profits in the review year with its profits in so-called "base years," an approach sanctioned by this court in *Gibraltar Mfg. Co. v. United States*, 212 Ct.Cl. 226, 546 F.2d 386 (1976) in circumstances where the base years are actually comparable. Dr. Mock first took the years 1962–65, an allegedly "normal" time period in which Kay performed very little renegotiable work and profits from its commercial

**16.** Of the 249 companies represented in the Renegotiation Board Standard Industrial Classification Code 3500 (the machining industry), every company showed materials values as a part of cost of goods sold. Thus no other company was, like Kay, exclusively a "service" company. The same was true for the four other subcontractors of Kisco during 1969. Defendant's expert witness, therefore, concluded that no comparison between Kay and competitive companies would be useful.

work averaged 13.23%. Alternatively, Dr. Mock used the time period 1970–71, explaining that during this period increased competition and reduced demand by the government created a situation more closely approximating that of a free market. During this period, plaintiff's profits ran close to 15%. By comparison, Dr. Mock concluded that plaintiff's 1969 profits of approximately 27.5% of sales were clearly excessive, and that a 16% rate of return,[17] including $20,000 credit for the statutory factors of efficiency and reasonableness of costs, was appropriate. Thus, he determined that plaintiff had realized excessive profits in the amount of $165,128.

Defendant's "comparative evidence," as even the Trial Judge found, was totally insufficient "because of significant dissimilarities in these periods as well as various computation errors in these comparisons." For example, during the 1962–65 period, Kay performed almost no renegotiable work, it was operated as a partnership rather than a corporation, and its sales never exceeded $200,000 and were frequently below $100,000 (compared to its sales of $1,202,125 in 1969). Thus, as the Trial Judge concluded, "[g]iven the nature of differences in Kay's type of work, volume of sales and corporate structure, any compari-

sons between 1962 to 1965 and 1969 are, at best, of marginal utility." Similarly, the significant disparity between the 1970–71 base period and the review year, because of the sharp decrease in government demand for the product and plaintiff's correspondingly sharp decrease in production and rate of return for those years, makes an attempt to compare the two periods useless.[18] Defendant failed to except to these findings by the Trial Judge that its "comparative evidence" was without merit.

Defendant denied the validity of plaintiff's proof generally, but made no effort to place into evidence data that would refute plaintiff's favorable evidence comparing Kay with its competitors. The Trial Judge's later attempt to correct what she perceived as deficiencies in plaintiff's theory was made without the aid of any convincing proof supplied by defendant and consequently suffers fatally from its hypothetical nature.[19] It cannot, therefore, serve as the basis for recovery by defendant.

Defendant argued at several points that plaintiff's higher profits in the review year resulted from the increased volume of production, and that under the regulations, plaintiff should be forced to return some of the profits to the government. Under the

17. Dr. Mock obtained this figure by concluding that a "normalized profit" rate would be 13.23%, based on a comparison with the 1962–65 profits, which should be further adjusted downward by a factor of .0118% for high volume to 12.05%. To this he would add the $20,000 credit for the statutory factors. The Trial Judge noted that because of various computational errors, this theory of determining excessive profits does not necessarily result in or support defendant's conclusions as to the amount of excessive profits of $165,128.

18. Dr. Mock admitted that the decline in demand resulted from the government's decreased need for the product because of the situation in Southeast Asia. It was not a function of increased competition by new entrants into the market, as might be expected in a normal competitive market.

19. We find a number of weaknesses in the Trial Judge's approach which render her analysis inadequate for showing plaintiff's profits were excessive. First, evidence in the record was admittedly incomplete, at best, concerning the

normal profit mark-ups on materials taken by companies purchasing their own materials. In light of witness estimates ranging from 5 to 10 percent, the Trial Judge chose 10% as an appropriate profit mark-up, without providing any support for that choice. Second, the Trial Judge noted that imputed costs, such as materials costs, and breakdowns of machining operations for various industry groups were hypothetical. Nevertheless, in the interest of making "some meaningful comparisons" she used these hypothetical figures, even "absent any evidence concerning actual computations and breakdowns." Finally, in comparing Kay's redetermined profits (including and excluding materials costs) with those of various industry groups, the Trial Judge noted that profit figures for the companies within those groups were post-renegotiation, rather than actual, figures, and that those for Kay's three major competitors were merely estimated. These estimates may or may not bear a resemblance to the final actual profits made by the companies, but no evidence on this point was introduced.

statute, "[f]avorable consideration will be given to an increase in volume of production for defense purposes." 50 U.S.C.App. 1213(e)(1). The applicable regulation, however, provides that "when the Government's demand has enabled the contractor to increase his sales *without exceptional effort and without corresponding increases in costs*, decreased unit costs result, and the Government should normally get the principal benefit in more favorable prices...." 32 C.F.R. § 1460.01(b)(3) (1978) (emphasis added). Defendant, however, has made no showing whatever that this regulation should apply in the instant case. In fact, the findings of the Trial Judge attest to the exceptional effort made by Kay during the review year in its successful attempt to meet the desperate need of the government for the 105–mm. cartridges. The decline in Kay's profits from 1967 through the review year, in spite of the greatly increased volume of production, also indicate that, whatever the benefits attributed to increased familiarity with the product, they must have been at least partly consumed by the increased costs of meeting the higher production schedule. Thus, defendant has failed to rebut this argument with convincing evidence.

This is not a case where defendant argued that no type of comparative evidence could possibly be produced because of the uniqueness of Kay's situation. In that event the government may "meet its burden, if it can, with other proof." *Manufacturers Service Co. v. United States*, 217 Ct.Cl. 387, 405, 582 F.2d 561, 573 (1978).[20]

Equally disturbing to the court is defendant's total failure to substantiate its assignment of a $20,000 credit to Kay for the statutory factors of efficiency and reasonableness of costs. As the Trial Judge noted, Dr. Mock justified this value as a "best guess" on the basis of his experience, providing no empirical foundation, formula or correlation for the $20,000 figure. We point out in passing that the Trial Judge's subsequent assignment of a $35,000 value to plaintiff's credit under the factors of efficiency, reasonableness of costs, and contribution to the defense, is similarly without empirical basis. Where plaintiff has met his preliminary burden of a *prima facie* showing of reasonable profits on the basis of his accounts and the statutory factors, the defendant must rebut plaintiff's reliance on the statutory factors with convincing data in order to carry its burden of proof. As we have stated previously, "[c]onfronted with claims for favorable consideration of this kind, defendant could either refute them or concede them. If it did the latter, as in several instances here, it would seem the burden of proof would require defendant to put a cap on the claim, ..." and "if the record fails to provide such quantification, it would seem the party having the burden of proof must lose." *Butkin Precision Mfg. Co. v. United States*, 211 Ct.Cl. 110, 130–31, 544 F.2d 499, 510–11 (1976). Such is the situation in the instant case.

In summary, defendant has neglected to carry its burden of proof by utterly failing to create a context, through comparative evidence or otherwise, in which we can judge whether plaintiff's profits were excessive. As we said in *Major Coat*, "[t]he court seeks to base its redeterminations of profit excessiveness upon hard evidence to preclude a foray into the realm of arbitrari-

---

20. Alternative methods of proving the excessiveness of plaintiff's profits have been recognized by this court when comparative data is demonstrated to be unobtainable. *See, e.g., Kilgore v. United States*, 222 Ct.Cl. 189, 205–06, 613 F.2d 279, 288 (1979) and *Dynasciences Corp. v. United States*, 214 Ct.Cl. 643, 654 (1977) (comparison of plaintiff's actual profits with its estimates to the government in the negotiation process); *Bethlehem Steel Corp. v. United States*, 191 Ct.Cl. 141, 154, 423 F.2d 300, 307 (1970) (reasonableness of profits as measured by the Defense Department Weighted Guideline Standards); *Mills Mfg. Co. v. United States*, 215 Ct.Cl. 536, 556–57, 571 F.2d 1162, 1173 (1978) (percentage return on equity where capital is important in producing profits). Defendant may also demonstrate the extent to which high profits are the result of high prices, where that is appropriate. It must be emphasized, however, that such proof is not allowed for primary reliance on by defendant unless defendant has first clearly shown that comparative evidence is impossible to obtain.

ness." *Id.* 211 Ct.Cl. at 47, 543 F.2d at 124 (citing *Aero Spacelines, Inc. v. United States*, 208 Ct.Cl. 704, 728–29, 530 F.2d 324, 339–40 (1976). Defendant has fallen far short of providing the kind of hard evidence that would enable us to determine what portion, *if any*, of plaintiff's profits were unreasonably high. Although the type of "judgmental adjustments and reworkings of the data" engaged in by the Trial Judge may have been permitted (though not encouraged) by our 1976 decision in *Major Coat*, it cannot be said that the five-year transition period (which the government has now reveled in long enough) has been too short. The implications were clear in 1976; the court will no longer carry defendant's burden in 1982. The "limited span of time" granted by our *Major Coat* decision is at an end.

## CONCLUSION OF LAW

Upon the findings of fact which are made a part of the judgment herein, and for the reasons given in the opinion, the court concludes as a matter of law that for the fiscal year 1969, plaintiff Kay Manufacturing Co. realized no excessive profits from subcontracts subject to renegotiation. Judgment is hereby entered for plaintiff on defendant's counterclaim and it is ordered that plaintiff is entitled to a refund of all amounts paid to defendant, if any, together with interest as provided by the Renegotiation Act of 1951, as amended.