699 F.2d 1367
 August GAVA, Jr., Appellee,
v.
The UNITED STATES, Appellant.
 Appeal No. 317-78.
 United States Court of Appeals,
Federal Circuit.
 Feb. 18, 1983.
 
 Donnie Hoover, Washington, D.C., argued for appellant; with him on brief was J. Paul McGrath, Asst. Atty. Gen., Washington, D.C.
 Before FRIEDMAN, NICHOLS and BALDWIN, Circuit Judges.
 FRIEDMAN, Circuit Judge.
 
 
 1
 This is an appeal by the United States from a judgment of the United States Claims Court* that, under the Equal Access to Justice Act, 28 U.S.C. Sec. 2412 (Supp. V 1981) (the Act), the appellee is entitled to attorney's fees for his successful challenge in the Court of Claims of his dismissal from civilian employment by the United States Army. Insofar as here pertinent, the Act entitles a litigant who prevails in a civil action against the United States to attorney's fees unless the court finds that "the position of the United States was substantially justified." 28 U.S.C. Sec. 2412(d)(1)(A) (Supp. V 1981). The Claims Court ruled that the position of the United States here was not substantially justified. We reverse that determination, and therefore hold that the appellee is not entitled to attorney's fees.
 
 I.
 
 2
 A. In May 1974, the appellee Gava was a civilian employee of the Army in Korea, serving as a division chief at a supply depot. Gava had become a civilian employee of the Army in Korea in 1965, following service as a Warrant Officer. He served until January 1971 in a noncompetitive status. In that month, as a condition of receiving a position in the competitive service, Gava signed a written agreement with the Army that he understood "that this overseas assignment is limited to a maximum of one year" and that he was "expected to return to the United States at the end of the one year period."
 
 
 3
 In November 1973, almost three years after Gava had signed the agreement, he was offered an assignment in Texas. The offer ultimately was withdrawn after Gava hospitalized himself for a knee condition that initially was believed to require surgery, but that turned out not to need that treatment.
 
 
 4
 On May 24, 1974, the depot commander sent a written recommendation to the Army's Civilian Personnel Officer that Gava be removed from his position for unauthorized use of government property, namely, its diversion to a Korean orphanage. Gava received a copy of this memorandum.
 
 
 5
 Approximately a week later, Gava received an offer of another assignment in the United States (in Michigan) to do the same work and at the same grade as in Korea. The offer stated that if he declined it, he was "subject to separation from Federal Service." Gava declined the offer "[f]or the following reason: Due to the adverse action and defamation of character previously filed against the undersigned ... I will not accept employment outside of Korea until this matter is resolved to my satisfaction."
 
 
 6
 Three days later the Army gave Gava a proposed written notice to terminate his employment "for failure to accept a valid assignment in the United States in accordance with your employment agreement ...." In a written reply to the notice, Gava contended: (1) that the 1971 employment agreement was "null and void"; (2) that he was not obligated to accept the tendered position because (a) he had not received the benefits of the career status that had been promised him when he signed the employment agreement and (b) it had not been shown that the new position was in the competitive service or that his reassignment was in accordance with established personnel rotation policy or would serve the best interests of the Army; and (3) that in February 1972, he had submitted a grievance that was unresolved and that he was the subject of a recommendation for disciplinary action, and that "I need to remain in Korea both to press my grievance and to defend myself against alleged misconduct ...."
 
 
 7
 In its decision on the merits in this case, the Court of Claims determined that "[u]nbeknownst to plaintiff until nearly three months later, the May 24th request for disciplinary action had been terminated and withdrawn contemporaneously with the issuance of the notice of proposed separation." August Gava, Jr. v. United States, No. 317-78 (Ct.Cl. Oct. 24, 1980) (order granting summary judgment).
 
 
 8
 After considering Gava's answer, the Army decided to terminate his employment. That action was stayed pending Gava's appeal to the Army's Civilian Employee Appellate Review Office. After a hearing, the Review Office sustained the removal. In February 1975, the Army terminated Gava's employment.
 
 
 9
 After another hearing, the Federal Employee Appeals Authority of the Civil Service Commission ruled that the reassignment was valid, and that Gava's refusal to accept it warranted the Army's action in removing him. On November 11, 1975, the Civil Service Commission Appeal Review Board upheld this determination, and on March 11, 1976, the Board rejected Gava's request to reopen the case.
 
 
 10
 B. Gava filed suit in the Court of Claims on July 12, 1978, challenging his discharge and seeking backpay and reinstatement. Both parties moved for summary judgment. In his motion for summary judgment, Gava contended:
 
 
 11
 (1) The Army's dismissal of him was arbitrary and capricious because the pending disciplinary proceeding, which he believed was still pending and required his presence in Korea, justified his refusal of the transfer.
 
 
 12
 (2) The Army had not shown that Gava's dismissal was for the good of the Service.
 
 
 13
 (3) The 1971 employment agreement was null and void, and under Army regulations, Gava was not required to accept reassignment.
 
 
 14
 (4) Laches did not bar Gava's suit as the government contended.
 
 
 15
 The government, in turn, filed a brief contesting these contentions. The government argued that: (1) Gava's 28-month delay between the decision of the Appeal Review Board and the filing of his case barred his suit under the doctrine of laches; (2) in view of the broad discretion of the government to reassign personnel and Gava's general familiarity with personnel practices, the government was justified in discharging Gava because of his refusal to accept the reassignment; (3) the 1971 employment agreement was valid in 1974; and (4) both this agreement and the Army's regulations justified Gava's reassignment.
 
 
 16
 On October 24, 1980, the Court of Claims granted Gava's motion for summary judgment and denied the government's motion. The court decided only two issues. It rejected the government's contention that laches barred Gava's claim. On the merits, it held that "the totality of the circumstances in this case demonstrates beyond any doubt that plaintiff's dismissal was arbitrary and capricious."
 
 
 17
 The court recognized that federal agencies have "broad latitude to make reassignments of their personnel." It concluded, however, that the Army's dismissal of Gava was arbitrary and capricious. The court stated that the Army knew "that the disciplinary action formed the very basis for plaintiff's decision to decline the reassignment" and that the record showed that Gava had "a legitimate, real and express concern about the difficulties he would encounter in defending an adverse action many thousands of miles from its place of occurrence." It ruled that in these circumstances, the Army's failure either to inform Gava that the proposed disciplinary charges had been withdrawn or to counsel him about alternatives to immediate reassignment invalidated his discharge for refusal to accept the transfer.
 
 
 18
 After considerable time, the parties agreed upon the amount of backpay to which Gava was entitled. On September 23, 1981, the parties filed with the court a stipulation for entry of judgment for Gava of approximately $113,644. The Court of Claims entered judgment in accordance with the stipulation on October 2, 1981, the day after the Equal Access to Justice Act became effective.
 
 
 19
 C. Following the entry of judgment, Gava filed an application under the Act for attorney's fees and expenses of $11,680.47, which the United States opposed on several grounds. The trial judge ruled that Gava was entitled to attorney's fees and expenses, but set for hearing the determination of the amount of the award.
 
 
 20
 With respect to the issue we deem determinative--whether the position of the United States was substantially justified--the trial judge stated that "[t]he facts of this case, as set out in the court's order granting summary judgment in plaintiff's favor, provide ample evidence that the government's action was not substantially justified." The judge quoted with approval the statement in Photo Data, Inc. v. Sawyer, 533 F.Supp. 348, 352 (D.D.C.1982), that "the Court must scrutinize not only the government's theory in defending the legal issues raised but also the occurrences that impelled plaintiff to bring this action." The judge discussed the facts leading to Gava's dismissal, quoted extensively from the prior decision in this case, and concluded:
 
 
 21
 Defendant's argument that the government's action was substantially justified because the government had the right to reassign plaintiff to another location, and that plaintiff had no right to refuse, except on pain of termination, is a mere reiteration of its prior position on the merits, without any recognition of the other circumstances which convinced the court, without need for a trial, that defendant's conduct was arbitrary and capricious.
 
 II.
 
 22
 A. As noted, a successful litigant against the United States may not recover attorney's fees under the Act if "the position of the United States was substantially justified." In Broad Avenue Laundry and Tailoring v. United States, 693 F.2d 1387 (Fed.Cir.1982), we recently examined the standards for determining that issue. We held that the "position of the United States" to be evaluated is the position taken "in the 'civil action' in which the attorney's fees were 'incurred.' " Broad Avenue, supra, at 1390.
 
 
 23
 We further held that the test for determining whether the position of the United States was "substantially justified" was one of reasonableness, and that reasonableness "depends upon all of the pertinent facts of the case." Id. at 1391. We pointed out that although "[f]ixed rules cannot be established for determining the issue," two guidelines could be stated: (1) "[T]he mere fact that the United States lost the case does not show that its position in defending the case was not substantially justified;" and (2) "the position of the United States is not shown to have been substantially justified merely because the government prevailed before the tribunal below and endeavored to uphold the decision in its favor." Id. at 1392.
 
 
 24
 The government apparently contends that the correct standard for determining substantial justification is not reasonableness, but whether its conduct was "reprehensible." It refers to two decisions of the Court of Claims which indicated that attorney's fees could be awarded if the government's conduct in litigating the case was so characterized. Estate of Berg, 687 F.2d 377 (Ct.Cl.1982); In re Papson, No. 602-80T (Ct.Cl. order, June 18, 1982). Those statements may relate to another provision of the Act (28 U.S.C. Sec. 2412(b) (Supp. V 1981), making the United States liable for attorney's fees when a private party would be liable "under the common law," i.e., when it acted in bad faith. See H.R.Rep. No. 1418, 96th Cong., 2d Sess. 8-9, and H.R.Conf.Rep. No. 1434, 96th Cong., 2d Sess. 25, reprinted in 1980 U.S.Code Cong. & Ad.News 4986-87, 5014. In any event, Broad Avenue announced the rule that the standard of substantial justification is reasonableness, and that is the standard we apply.
 
 
 25
 B. We cannot agree with the trial judge that the government's position in litigating this case before the Court of Claims was not substantially justified.
 
 
 26
 As the Court of Claims recognized in its prior decision, the government has broad discretion to reassign its employees to different locations, and to discharge them for refusal to accept a new assignment. See, e.g., Leefer v. United States, 215 Ct.Cl. 1061 (1978). The government's arguments supporting the applicability of this principle to Gava's case, were cogent. The government pointed out that no disciplinary proceeding actually had been instituted against Gava (it only had been recommended), that Gava asserted other reasons besides the pending possible removal proceedings as justification for his refusal to accept the reassignment, and that there was no need to counsel Gava about the alternatives to refusing the reassignment because "the record demonstrates that the plaintiff was well aware of his alternatives as a result of and as shown by events surrounding a previous avoidance of an offer to rotate."Although the Court of Claims rejected the government's position on this issue and characterized the Army's discharge of Gava for refusing to accept the reassignment as arbitrary and capricious, the government had a reasonable basis for litigating the issue before the Court of Claims. Here, as in Broad Avenue, "it was far from clear that the [Army's] decision was erroneous or that the Court of Claims would reverse it." At 1392. Indeed, on the first page of his brief in support of his motion for summary judgment, Gava twice described the question whether the government could reassign him in these circumstances as "one of first impression."
 
 
 27
 The government also had a reasonable basis for litigating the other issues in the case. The government cited several cases in which delays of less than the 28 months here were held to constitute laches. Although the court rejected the laches argument, that fact does not establish that the government's position on the issue was not substantially justified. Broad Avenue, supra. Furthermore, the government was justified in arguing that under the 1971 employment agreement Gava was required to accept reassignment to the United States in 1974, and that such reassignment violated neither the agreement nor Army regulations.
 
 
 28
 C. The precise rationale for the trial judge's ruling that the government's position was not substantially justified is unclear. The trial judge's reliance on the statement in Photo Data, supra, coupled with his discussion of the facts surrounding Gava's dismissal and his quotation of the lengthy passage from the prior Court of Claims decision criticizing the discharge, suggests that he may have given significant, or possibly controlling, weight to the view that because the discharge was improper, the government was not justified in defending it.
 
 
 29
 Our subsequent decision in Broad Avenue, however, pointed out that although "[t]he justification for the government's litigating position necessarily implicates the decision of the tribunal being reviewed ... the court is not to re-examine the administrative proceedings in an attempt to determine whether the party seeking the attorney's fees should have prevailed before that tribunal." In determining an application for attorney's fees under the Act, the inquiry is directed to the justification for the government's litigating position before the court, not the justification for the government's administrative action that prompted the suit.
 
 
 30
 The fact that the government lost its case in the Court of Claims does not establish that the government's litigating position before the court was not substantially justified. Broad Avenue, supra. This is so even where, as here, the court's decision was highly critical of the government's action that the suit challenged.
 
 
 31
 The judgment of the United States Claims Court that the appellee is entitled to attorney's fees and expenses is reversed.
 
 
 32
 REVERSED.
 
 
 33
 NICHOLS, Circuit Judge, concurring.
 
 
 34
 I join in the judgment, and in the opinion of the court, except where subsequent remarks may be inconsistent.
 
 
 35
 I fear I may have authored the use of the word "reprehensible" as descriptive of the attorney conduct which might justify an award of counsel fees to a party litigating against the government under 28 U.S.C. Sec. 2412. It seems to cause the present panel some embarrassment. I do not think the panels in Papson v. United States, Ct.Cl. No. 602-80T (order entered June 18, 1982, to be published, 231 Ct.Cl. ---), or in Estate of Lillian G. Berg v. United States, 687 F.2d 377 (Ct.Cl.1982), intended to construe the statute as defendant now says that court did construe it, as limited to instances of censurable, or culpable behavior, or measures taken in bad faith. Such a construction would have gone far to nullify the statute and would have been dictum in the cases before the court, when the actions of government counsel had been perfectly reasonable, things such as we ourselves would have done if in their place, probably, though they did not prevail and we would not have either. In Webster's Unabridged, the preferred meaning of "reprehend" is "voice disapproval of, especially after judgment" and the preferred meaning of "reprehensible" is "worthy of being reprehended." I continue to believe a court should not award counsel fees unless its attitude towards the conduct of government counsel includes some degree of disapproval, but I presume Judge Friedman would disapprove of conduct he held unreasonable, so there is no disagreement between us in this case.
 
 
 36
 It is probably wise to deep-six use of the word "reprehensible" in this context, because it also has dictionary meanings denoting conduct that really stinks. In other words, it is ambiguous, and what it meant to the Court of Claims panels is not necessarily what it might mean to others. One cannot argue one's words are impossible to misconstrue when someone has in fact misconstrued them. We will in the future try to give content to the word "unreasonable" in application to concrete cases. As with obscenity, we may not be able to define the conduct Congress meant to single out, but we will know it when we see it. I think, in light of the statutory purposes, disapproval of attorney conduct is enough to award fees, even though it was taken in good faith and fell short of the censurable or culpable. Government counsel here made a most persuasive argument that his actions in the Court of Claims had been such as any attorney seeking in good faith to defend his client's interests would have felt obliged to take, and I could not voice disapproval myself, even disapproval free from censure.
 
 
 37
 The court so far has attempted to apply its reasonableness test under 28 U.S.C. Sec. 2412 chiefly or wholly by assessing the government attorney's reasonableness in expecting that his contentions of fact and law would prevail. This, of course, is a factor not to be overlooked, but it is not all. On the one hand, duty might require a government counsel to take a stand which, though not frivolous, stood as he knew but a slim chance of prevailing. On the other hand, there are in my view other cases where government conduct, though subjectively in good faith, is in fact oppressive. It is quite clear to me, both from the text of the statute itself, with its limits on the size or wealth of the claimant who may receive an award of fees, and from the legislative history, that Congress perceived the existence of litigants not having the resources of the United States, and that this inequality, coupled with oppressive exploitation of it, might at times effectively deny justice even though not so intended.
 
 
 38
 Broad Avenue Laundry and Tailoring v. United States, 693 F.2d 1387 (Fed.Cir.1982) (Broad Avenue II), is an example of the first category. An agency such as the Department of Defense, which goes to the trouble of creating an independent, impartial, and well-qualified board, to hear disputes under its procurement contracts according to the principles of due process, is certainly entitled to expect that the resulting board decisions will be supported and defended in the Article III courts by the only counsel the agency is permitted to employ there. Possibly instances may occur when this is not so, but frankly, I have never seen one in the 18 years I have been engaged in adjudicating such cases, and I believe they must be rare. Broad Avenue I was not such a case. There was oppressive behavior towards Broad Avenue, an innocent and confiding small business that was shamefully treated, but this was not by Department of Justice attorneys and not in the Court of Claims. The case came to that court fit for adjudication by appellate review, and it was thus adjudicated, a procedure easy on the resources of small litigants. The government position was highly obnoxious in that it exploited what it said was the absence of authority and ignorance of relevant law on the part of its duly designated contracting officer. Also, the government position would, had it prevailed, have undermined the foundations of disputes clause procedure by compelling government contractors to challenge contracting officer's orders, and to defy them, instead of obeying them and claiming relief as for a constructive change order. But these were errors of the board, not of government counsel in the Court of Claims, and were res gestae when the case got to that court. They were far short of the extraordinary case that would have justified denying the board decision any defense.
 
 
 39
 In Kay Manufacturing Co. v. United States, 676 F.2d 555 (Ct.Cl.1982) (Kay I), I saw and am urging in my dissent in Kay II, that the court see an example of outrageous oppression displayed right in the Court of Claims, which that court could not ignore. The reasons why I think that are fully spelled out in the dissent and need not be repeated here. At the time Kay's petition was filed in the Court of Claims, the government may have had a valid claim for refund of excessive profits and the Renegotiation Board had certainly thought so. But by the peculiar provisions of the Renegotiation Act, the case had to be retried de novo and the board decision enjoyed no presumption of validity. Thus the conditions that in an ASBCA case virtually compel Department of Justice counsel to adopt and defend the board position, did not at all obtain in Kay. Government counsel was entirely free to dump, and in fact did dump, the board decision, and embarked on a line of his own, for which he must take moral responsibility, if it was oppressive. Whatever the situation had been on the original filing date, when the case went to the usual prolonged and costly trial, prospects of government success were gone because counsel pursued a line of his own choice, in which he had no prospect of success.
 
 
 40
 This case, Gava, is different from either. Counsel was not virtually committed to a board line, as in Broad Avenue, but on the other hand, I see nothing oppressive about his conduct. First, it was a summary judgment case. There was no prolonged and costly trial. Second, counsel was confronted with a number of extravagant claims which could have eventuated in holdings which were most undesirable precedents from the government point of view. Government counsel must consider, far more than private counsel, the precedential impact of what occurs in his cases. The Gava decision may be considered a success from the government point of view, inasmuch as it went off on grounds that will rarely recur and undesirable precedents were averted. Third, whatever cost and inconvenience claimant was put to was more or less the result of his own conduct, which was in several respects unreasonable. If he not only gets back pay and reinstatement, but counsel fees besides, there is provided a disincentive for government employees to act reasonably. Fourth, the duty of a government counsel in an Article III court no doubt includes extricating his client, the government, from the adverse consequences of the client's officer's blunders, however egregious.
 
 
 41
 I suppose I would allow government counsel a broader scope to make assertions of fact or law possibly but not likely to be accepted by the court, if he makes them on appeal or in a summary judgment motion and not in course of bringing about a prolonged and costly trial. The issue of substantial justification is in my view to be balanced and weighed equitably in light of the resources of the adverse party and the type of court proceeding involved. It should not be forgotten, too, that counsel in a court proceeding is an officer of the court. The court has an interest in averting the abuse of its process and the waste of judicial resources. It appears to me that 28 U.S.C. Sec. 2412 is to be regarded as one of the means Congress has put in the hands of the judiciary to use towards these ends, and the law is to be construed with that in mind.
 
 
 42
 If an attorney for, say, the John Hancock, so disapproves of his client's decision in some matter that he declines to defend it in court, this is not a serious matter as the client is free to find other counsel. If a Justice Department lawyer so disapproves of a Department of Defense decision that he declines to defend it in court, that is a more difficult matter to resolve, because the Department of Defense is allowed no other counsel. It seems to me that government counsel in Gava, to please our dissent herein, would have had to so refuse, and yet the problems of the merits panel would have been multiplied if the government had had no effective advocate. It did have one, whose efforts were helpful to the court even if he did not prevail. Here is a dilemma, and how we mete out disapproval should be influenced by our notions about it.
 
 
 43
 BALDWIN, Circuit Judge, dissenting.
 
 
 44
 I believe the majority opinion misapplies the "substantially justified" standard of the Equal Access to Justice Act (the Act) to the facts of this case. Therefore, I respectfully dissent.
 
 The Standard
 
 45
 I do not take issue with the majority's restatement of the broad guidelines set out in Broad Avenue Laundry for applying the "substantially justified" standard, which guidelines, in turn, track the language of the House Report on S. 265, the bill which became the Act. See H.R.Rep. No. 1418, 96th Cong., 2d Sess. 11, reprinted in [1980] U.S.Code Cong. & Ad.News 4984, 4989. However, I think further examination of the Act's legislative history usefully illuminates what Congress intended by "substantially justified," beyond the observation that the test is "one of reasonableness."
 
 
 46
 Specifically, the "substantially justified" formula was adopted as a compromise between the mandatory award of fees to prevailing parties and a proposal by the Justice Department that fees be awarded only where the contested government action was "arbitrary, frivolous, unreasonable, or groundless, or [where] the United States continued to litigate after it clearly became so." See Award of Attorneys' Fees Against the Federal Government: Hearings on S. 265 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary, 96th Cong., 2d Sess. 26 (1980) (statement of Sen. Dennis DeConcini) [hereinafter cited as 1980 Hearings ].
 
 
 47
 Those opposed to the "substantially justified" standard argued that:
 
 
 48
 It invites a retrial of the merits, putting at issue the reasonableness of the underlying claim or defense, and its factual foundation. Moreover, this inquiry would take place before a judge who had already determined that the Government's position was not a winning one. This could result in the requirement that the Government pay fees not where its conduct was arbitrary or unreasonable, but rather where it had made an honest mistake or misjudgment regarding the facts or law in a given case.
 
 
 49
 1980 Hearings, at 42 (statement of Alice Daniel). In contrast, supporters of S. 265 expressed the concern that the "arbitrary, frivolous, unreasonable, or groundless" standard would:
 
 
 50
 allow very few awards of attorneys's fees. It is interesting to note that this standard is already codified in 28 U.S.C. 1927, relating to liability for costs when counsel has increased costs "unreasonably and vexatiously." An examination of the opinions interpreting this statute reveals that courts have given a very stringent interpretation to the standard. The usefulness of the standard to small business is belied by the fact there are only a small handful of opinions since the enactment of the statute in 1948 in which the court actually found the facts of the case to be vexatious enough to merit an award of costs.
 
 
 51
 1980 Hearings, at 104 (statement of James D. McKevitt).
 
 
 52
 Ultimately, the "substantially justified" language was retained in lieu of the standard championed by the Justice Department. According to a principal sponsor of S. 265:
 
 
 53
 In order to recover fees under this [latter] standard, a party must first prevail and then must marshal the facts to prove that the government action had no legal or factual basis and that it was completely without foundation. Clearly, awards under this standard would be very difficult to obtain. And where fees are so difficult to recover, the deterrent effect created by the cost of vindicating rights vis-a-vis the government would not be assured.
 
 
 54
 * * *
 
 
 55
 * * *Under S. 265, fees will be awarded "unless ... the position of the United States was substantially justified or ... special circumstances make an award unjust." This language ... places the burden on the government to justify its actions in order to defeat an award. It is, therefore, strong enough to encourage people to vindicate their rights. It is strong enough to press the government to address the problems of abusive and harassing regulatory practices. And it is also strong enough to caution agencies to carefully evaluate their cases and not to pursue those which are weak or tenuous.
 
 
 56
 1980 Hearings, at 26 (statement of Sen. Dennis DeConcini).
 
 
 57
 From the foregoing, I conclude that the Act's "substantially justified" standard was intended to permit, inter alia, awards of fees to prevailing parties in suits brought by the United States when the reviewing court determines that the government has persisted in pressing a tenuous factual or legal position, albeit one not wholly without foundation. Accordingly, a judicial inquiry into whether "the position of the United States was substantially justified" under the Act necessarily includes an examination of the underlying facts on which the government's case is founded. It follows, moreover, that the existence of a colorable legal basis for the government's case is not dispositive of the "substantially justified" question.
 
 Application of the Standard
 
 58
 As the majority recognizes, the legal principle upon which the government relies in this case (that is, that the government has broad discretion to reassign its employees and to discharge them for refusing reassignment) has precedential support. However, I am unconvinced, based on the majority's citation of facts and allegations of fact made by the government, that the government's case did indeed have a reasonable basis in fact.
 
 
 59
 The Order of the Court of Claims dated October 24, 1980, sets out the uncontested facts which prompted the trial court to grant Gava's motion for summary judgment and dispose of the case on the briefs:
 
 
 60
 (1) It was not until September, 1974, more than three months after the request for disciplinary action had been withdrawn without notice to Gava, that Gava inadvertently discovered that the request had, in fact, been withdrawn.
 
 
 61
 (2) The government knew that the threat of a disciplinary action in Korea formed the basis for Gava's decision to decline reassignment.
 
 
 62
 (3) Between June, 1974, and February, 1975, the date when Gava's separation became final, the government did not avail itself of the opportunity to resolve the situation, although the government could have stayed Gava's transfer until the disciplinary matter was settled.
 
 
 63
 Against this backdrop, the majority mentions other factors in the case which support the decision to reverse the trial judge's award of fees to Gava. However, none of these, individually or collectively, convince me that the government's position was reasonable, rather than factually tenuous. Specifically, the observation that no disciplinary proceeding was actually instituted is a non sequitur; it was the threat of such action that prompted Gava's legitimate, real, and expressed concern over having to defend an adverse action from thousands of miles away.
 
 
 64
 Similarly nonprobative is the majority's reference to the fact that Gava asserted reasons in addition to the pending disciplinary proceeding to justify his refusing reassignment. The government was obliged to evaluate each ground for challenging the propriety of Gava's dismissal. Absent a reasonable basis for defending on any determinative issue in the case, the government's position cannot be deemed "substantially justified" under the Act.
 
 
 65
 Finally, the majority quotes the government's assertion below that Gava "was well aware of his alternatives [to declining or accepting reassignment] * * * as shown by events surrounding a previous avoidance of an offer to rotate." Even assuming an evidentiary basis for this allegation, I cannot see how the government's position on the arbitrariness of Gava's dismissal is thereby made more reasonable. After all, the entire dispute was born of the government's uncontested failure to give notice to Gava of the withdrawal of the request for disciplinary action. That Gava did not request a stay himself is basically irrelevant to whether the government's own conduct surrounding Gava's dismissal was arbitrary.
 
 
 66
 In summary, I do not believe the government has sustained its burden of demonstrating that its position in this case was substantially justified within the meaning of the Act.
 
 
 
 *
 Pursuant to an order of this court dated October 2, 1982, Judge Miller, on October 8, 1982, entered a final judgment in accordance with his recommended decision of July 20, 1982. We treat the government's exceptions to the decision as an appeal from the Claims Court's final judgment